Kim HOLLAND, Insurance Commissioner of the State of Oklahoma, In her capacity as receiver of Petrosurance Casualty Company, In Liquidation, and on behalf of its Insureds and Creditors, Appellant/Cross–Appellee,

v.

Charles Ray LOVELACE, Robert Carlin Lee, and Richard Wayne Miller, Appellees/Cross–Appellants,

and

Murrell, Hall, McIntosh & Co., PLLP, Appellee.

No. 05–09–00993–CV.

Court of Appeals of Texas, Dallas.

Aug. 30, 2011.

Rehearing Overruled Dec. 17, 2011.

Andrew W. Yung, Dennis J. Keithly, Jr., John B. Scott, Scott Yung, LLP, Dallas, TX, Stephen Jones, Jones, Otjen & Davis, Enid, OK, for Appellant/Cross–Appellee.

Thomas J. Fisher, Joseph W. Spence, Breccia M. McDermed, Shannon, Gracey, Ratliff & Miller, L.L.P., Fort Worth, TX, Ronald W. Johnson, Mark E. Smith, Amie P. Fordan, Touchstone, Bernays, Johnston, Beall, & Smith, LLP, Dallas, TX, for Appellees/Cross–Appellants.

Before Justices BRIDGES, LANG–MIERS, and MURPHY.

## OPINION

Opinion By Justice LANG–MIERS.

Appellant Kim Holland, in her capacity as Receiver of Petrosurance Casualty Company (PCC), brought this suit for damages against three former PCC officers and PCC's auditors and consultants. After a five-week jury trial, the trial court signed a judgment awarding Holland $30,000 in damages against appellees Charles Ray Lovelace, Robert Carlin Lee, and Richard Wayne Miller (together, the Officers). The trial court's judgment also provided that Holland take nothing from appellee Murrell, Hall, McIntosh & Co., PLLP (MHM). For the following reasons, we affirm the trial court's judgment in part and reverse in part and remand.

### BACKGROUND

PCC was an Oklahoma property and casualty insurer regulated by the Oklahoma Insurance Department (OID) and the Oklahoma Insurance Commission. PCC primarily wrote workers compensation insurance for the oil industry. The Officers controlled PCC, and also owned Petro General Agency (PGA), the managing general agency of PCC. MHM, an accounting firm, was PCC's independent auditor during the time period relevant to this lawsuit.

Oklahoma law requires that every three years the OID designate an independent examiner to conduct an examination of an insurer. In July 2000, Tommy Thompson, a financial examiner for the OID, began PCC's triennial examination. In a report dated March 15, 2001, Thompson stated that PCC was "impaired," that is, its assets minus its liabilities were less than $5 million. As a result, the OID placed PCC under the supervision of Cindy Sikorski as of that date. Under supervision, the Officers continued to manage the company with certain restrictions. In April 2001,

the OID directed Thompson to reopen the PCC triennial examination to resolve a discrepancy regarding the amount of PCC's reserves. Thompson's final May 21, 2001, examination report again stated PCC was impaired but not insolvent.

In January 2002, Carroll Fisher, then the Insurance Commissioner for the State of Oklahoma, filed an application for conservatorship of PCC with the Oklahoma Insurance Commission, alleging that PCC had not complied with the order of supervision; its surplus was less than $5 million; and PCC's condition was "such as to render the continuance of its business hazardous" to the public or to policyholders. This application and subsequent proceedings culminated in a court order of liquidation dated March 14, 2002, under which a receiver displaced PCC's management and took control of the company.

On March 1, 2004, Fisher brought this suit against the Officers, MHM, and others for damages in connection with the failure of PCC. Holland later became Insurance Commissioner and replaced Fisher as plaintiff. The case proceeded to a jury trial in which the evidence focused on the causes and extent of PCC's insolvency and damages. After three days of deliberations, the jury found that the Officers breached their fiduciary duties to PCC, but did not find that MHM knowingly participated in the breach. The jury made findings to support a conclusion that Holland's negligence claims were barred by limitations. The jury also found that the conduct of MHM, the Officers, Holland, the OID, and PricewaterhouseCoopers, LLP (a settling defendant), all contributed to PCC's injuries. The jury awarded Holland $5 million for past damages and $5 million for future damages. But after the trial court made deductions for proportionate responsibility percentages and a settlement credit, and reduced the award by

$4.2 million "for ERISA damages," the trial court's judgment awarded only $30,000 to Holland.

## ISSUES

Holland appeals and the Officers cross-appeal. Holland brings five issues for our review: (1) the trial court erred by failing to grant her motion for new trial on the basis of jury misconduct, (2) the trial court erred by allowing appellees to designate the OID as a responsible third party, (3) the trial court erred by granting appellees eight peremptory challenges when no antagonism existed among them, (4) the trial court erred by failing to grant Holland's motion for new trial because the damages awarded by the jury were manifestly too small and were not supported by the evidence, and (5) the trial court erred by ruling that a portion of Holland's claims were preempted by the federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (2010).

In their cross-appeal, the Officers allege that the trial court erroneously overruled their motions for directed verdict and for judgment notwithstanding the verdict. They present three issues: (1) Holland's claims for breach of fiduciary duty are barred by limitations, (2) Holland failed to submit and obtain jury findings on her discovery rule defense, and (3) the Officers conclusively established that the discovery rule does not "save Plaintiff's breach of fiduciary duty claim against the Individual Defendants from the statute of limitations."

With regard to MHM, Holland challenges only the trial court's denial of her motion for new trial with regard to alleged jury misconduct and the trial court's ruling on her objection to the allocation of peremptory strikes. Because both of these issues apply to all parties, we address those two issues, issues 1 and 3, first.

## JURY MISCONDUCT

In her first issue Holland argues that the trial court abused its discretion when it denied her motion for new trial based on alleged jury misconduct. As evidence, Holland presented five affidavits, one deposition, and testimony from three jurors and one alternate juror. In response, appellees argue that Holland overstates the evidence of misconduct, and that the trial court properly denied Holland's motion for new trial because Holland did not demonstrate that the alleged misconduct caused her sufficient injury to warrant a new trial.

### Applicable Law and Standard of Review

■ To obtain a new trial on the ground of jury misconduct, the movant must establish that the misconduct (1) occurred, (2) was material, and (3) probably caused injury. TEX.R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 372 (Tex.2000). To show probable injury, there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would have done otherwise on one or more issues vital to the judgment. *Pharo v. Chambers Cnty.,* 922 S.W.2d 945, 950 (Tex.1996). There is no probable injury when the jury probably would have rendered the same verdict even if the misconduct had not occurred. *Sharpless v. Sim,* 209 S.W.3d 825, 828 (Tex.App.-Dallas 2006, pet. denied). If we conclude that there is no injury, we do not need to determine whether the alleged misconduct was material because the "absence of harm is fatal to the inquiry." *Id.*

■ Additionally, whether misconduct occurred and caused injury is a question of fact for the trial court. *Golden Eagle Archery,* 24 S.W.3d at 372. Absent findings to the contrary, we must assume that the trial court made all findings in support of its decision to deny the motion for new trial. *Id.* We review a trial court's denial of a motion for new trial based on jury misconduct under an abuse of discretion standard. *See, e.g., Hutton v. AER Mfg. II, Inc.,* 224 S.W.3d 459, 463 (Tex.App.-Dallas 2007, pet. denied). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). At a hearing on a motion for new trial, the trial court is the trier of fact and the sole judge of the witnesses' credibility. *D. Burch, Inc. v. Catchings,* No. 05–08–00278–CV, 2009 WL 2581862, at *2 (Tex. App.-Dallas Aug. 24, 2009, pet. denied) (mem. op.). As a result, "[w]e defer to the trial court's determinations on credibility when considering evidence concerning a motion for new trial." *In re T.R.D.,* No. 03–09–00150–CV, 2010 WL 2428426, at *2 (Tex.App.-Austin June 18, 2010, no pet.) (mem. op.).

### Analysis

#### Claimed Misconduct

Holland complains about alleged pre-deliberation jury misconduct that falls generally into six categories.[1] We address each category separately.

*(1) Commentary during trial about Holland's case*

■ Holland argues that the jury's misconduct included "incessant negative com-

---

1. Holland focuses on pre-deliberation misconduct because the Texas Rules of Civil Procedure and the Texas Rules of Evidence prohibit jurors from later testifying about matters and statements that occurred during the course of their deliberations. *See* TEX.R. CIV. P. 327(b); TEX.R. EVID. 606(b).

mentary against [Holland's] case regarding substantive facts and credibility of witnesses." After reviewing the record, including the testimony Holland cites to support her argument, we conclude that the evidence does not demonstrate that the jury made incessant negative comments about her case. For example, to support her argument, Holland cites the following exchange between Holland's counsel and juror Ford during Ford's post-trial deposition:

> Q. Did you ever hear [juror] Payan or [juror] Dysert give any indication whatsoever or any positive statement whatsoever prior to deliberations that they would consider finding for [Holland]?
>
> A. No.

But the fact that two jurors did not indicate, prior to deliberations, that they would consider finding for Holland is not, as Holland claims, an example of improper negative commentary about her case. There is some evidence that certain jurors made statements or comments about the case, and that juror Sandlin "talked a lot" and made comments that were "[t]ypically" "against the plaintiff." Even if we assume, however, that the trial court found that evidence to be credible, there is very little evidence of what any of those actual comments were. In juror Ford's deposition, she testified that during a break in trial, juror Payan commented, "[I]f [counsel for Holland] keeps on talking, I'm not going to give him anything." But the record demonstrates that juror Payan was part of the 10–juror majority that awarded Holland $10 million in damages. And although there is vague evidence that some unspecified negative comments were made, there is no evidence that any comment most likely caused a juror to vote differently than the juror would have voted otherwise on an issue vital to the judgment. *See Pharo*, 922 S.W.2d at 950. In fact,

when asked how hearing negative comments affected her, juror Dietlin, who also voted in the majority, testified, "It did not affect my decision."

*(2) Researching and discussing definitions of unfamiliar words*

■ Holland argues that it was "the regular practice of some jurors" to look up definitions of unfamiliar words and share the definitions with other jurors. And according to multiple witnesses, including juror Mito, juror Mito looked up the word "fiduciary" or the term "fiduciary duty" during trial and may have shared the definition with others. Also, alternate juror Jones testified that (1) four jurors looked up "[t]hree to four" words said by witnesses during trial, and (2) he believed juror Adams "looked stuff up" because juror Adams brought his computer to the jury room most days, and when other jurors asked him what some of the words meant, he told them. But there is no evidence that sharing the definition of "fiduciary" or any other word most likely caused a juror to vote differently than the juror would have voted otherwise on an issue vital to the judgment. *See Pharo*, 922 S.W.2d at 950.

*(3) Statements made by juror Payan about his "special knowledge"*

■ Holland argues that juror Payan committed misconduct by "presenting himself as one who understood all financial issues in the case." According to Holland, juror Payan talked to other jurors "about his expertise, opinions of the case, and the substantive meanings of words." And according to jurors who testified at the hearing on the motion for new trial, juror Payan told other jurors that he was "knowledgeable in finances" and "understood what was going on in the case." One juror also testified that near the end of the case, juror Payan "kind of made it seem

that there wasn't any, like, true, like, evidence stating that there was any damages or anything." But again, juror Payan was part of the 10–juror majority that awarded Holland $10 million in damages. And there is no evidence that juror Payan's statements about his level of knowledge or understanding of the case had any influence on the jury or caused a juror to vote differently than the juror would have voted otherwise on an issue vital to the judgment. *See Pharo*, 922 S.W.2d at 950. We also note that juror Payan responded to his subpoena and appeared at the hearing on Holland's motion for new trial, but Holland's counsel did not call him as a witness.

*(4) Researching and discussing Holland's counsel's political affiliation*

▮ Holland argues that prior to deliberations juror Adams used the internet to "Google" the name of Holland's lead counsel. Holland contends that Adams found information about her counsel's political affiliation and told other jurors about it. She contends that Adams used the information because he was "trying to persuade juror Ford." Holland further contends that this misconduct was material because the information was shared "on the eve of an historical national election."

Holland cites evidence from the hearing on the motion for new trial in which Ford testified that the jurors were sitting in the jury room prior to deliberations and talking about politics when Adams made the comment that Holland's counsel "must be a Republican, because he gave money to Giuliani." Ford said she thought Adams's comment was "a kind of shot at me" because Adams knew she was a Democrat. But Ford did not explain how Adams's comment was "a shot" at her. And she also testified that she "may have taken [the comment] wrong."

Adams testified that he used the internet to "Google" the name of Holland's counsel, but he said he did not click on any of the links, and he did not look up the firm or the firm's website. He also said he made a comment about what he found only to those jurors sitting around him. Adams testified that he is a Republican and that he did not know Ford was a Democrat. Adams and Ford were also part of the 10–juror majority.

Holland argues that she would have moved for a mistrial if she had known about these pre-deliberation comments "for fear of prejudice." But "fear of prejudice" is not the standard we use to determine whether the court should have ordered a new trial based on jury misconduct. The evidence about Adams's comment regarding counsel's political affiliation was conflicting, and there was no evidence that the comment influenced Ford's or any other juror's vote or otherwise resulted in probable injury. *See Pharo*, 922 S.W.2d at 950.

*(5) Discussion of the case in Spanish*

▮ Holland also complains that jurors Payan and Adams had substantive discussions about the case with juror Ortiz in Spanish both before and after the jury was charged. To the extent Holland complains about statements made by the jury during formal deliberations, we may not inquire about those discussions. *See* Tex.R. Civ. P. 327(b); Tex.R. Evid. 606(b); *Golden Eagle Archery*, 24 S.W.3d at 368. Holland presented evidence that some of the jurors spoke to Ortiz in Spanish in pre-deliberation discussions, but she does not cite any evidence that those conversations were about the case. And there is no evidence that any pre-deliberation discussions in Spanish caused a juror to vote differently than the juror would have voted otherwise on an issue vital to the judgment. *See Pharo*, 922 S.W.2d at 950. We also note

that Ortiz voted as part of the 10–juror majority.

*(6) Statements about how jurors were going to vote*

■ Holland complains that alternate juror Jones and juror Payan made statements that they were going to vote "adverse to" Holland based on who they wanted to win and not based on the facts of the case. Holland cites only alternate juror Jones's testimony at the hearing on the motion for new trial in which Jones admitted that he said something like, "[Holland's counsel] just lost my vote" one day when Jones was "running late for work." But Jones did not have the opportunity to vote because he was the alternate juror. And there is no evidence that other jurors heard that comment or that the comment influenced any of the jurors' votes. *See Pharo*, 922 S.W.2d at 950.

### Holland Did Not Satisfy Her Burden

Holland bore the burden to prove injury resulting from material jury misconduct. She generally argues that the alleged misconduct was prejudicial and that she was injured. More specifically, she argues that this case "involves old-fashioned misconduct and new age electronic misconduct— both of which were prejudicial," and she argues that "[i]n all likelihood" the alleged misconduct "affected one or more of the majority's votes leading to an improper verdict." She also argues that it is "untenable" to say there was "no prejudicial impact" resulting from the alleged misconduct. But she does not cite any evidence to demonstrate, and the record does not indicate, that any of the alleged misconduct most likely caused a juror to vote

differently than the juror would have voted otherwise on an issue vital to the judgment. *See Pharo*, 922 S.W.2d at 950.

■ Holland's primary complaint is that certain jurors violated the trial court's admonitory instructions. Certainly we do not condone violations of a trial court's admonitory instructions. But violation of a trial court's admonitory instructions alone is not sufficient to warrant a new trial. *See Soliz v. Saenz*, 779 S.W.2d 929, 934 (Tex.App.-Corpus Christi 1989, writ denied) (rejecting argument that "a party to a suit is entitled to a new trial, as a matter of law, upon proof of a violation of the admonitory instructions" because violation of admonitory instructions "is not sufficient grounds for a new trial"); *see also Sharpless*, 209 S.W.3d at 828 ("Although [juror's] violation of the court's admonitory instruction against independent investigation had the potential to cause harm, the act itself is not sufficiently prejudicial to justify a presumption of harm.").

In short, even if we were to assume that jury misconduct occurred, we cannot conclude that Holland satisfied her burden to prove that she was injured by the claimed misconduct because the record does not establish that the verdict would have been different had the misconduct not occurred. *See, e.g., Sharpless*, 209 S.W.3d at 828 ("Because there is nothing to establish that the verdict would have been any different had the misconduct not occurred, there is no probable injury."). After reviewing the record concerning the alleged pre-deliberation jury misconduct[2] under the appropriate standard of review, we cannot conclude that the trial court abused

---

**2.** In a footnote, Holland also cites juror testimony and argues that "there was evidence that no deliberations actually took place on damages." However, "jurors cannot impeach a verdict by testifying about the mental processes of the jurors regarding how they arrived at their answers on the damage issues." *Soliz*, 779 S.W.2d at 934. As a result, we do not address this argument.

its discretion when it denied Holland's motion for new trial based on alleged jury misconduct. We resolve Holland's first issue against her.

### PEREMPTORY CHALLENGES

In her third issue, Holland contends that the trial court erred by overruling her objections and granting appellees a greater number of peremptory challenges when no antagonism existed among them. On MHM's motion, the trial court allocated four peremptory challenges to MHM, four to the Officers, and six to Holland.

### Applicable Law and Standard of Review

■ In allocating peremptory challenges when multiple litigants are involved on one side of a lawsuit, a trial court must determine whether any of those litigants are antagonistic with respect to an issue of fact that the jury will decide. *Garcia v. Cent. Power & Light Co.*, 704 S.W.2d 734, 736 (Tex.1986). The existence of antagonism must be determined after voir dire and before the exercise of the peremptory challenges. *Id.;* TEX.R. CIV. P. 233. In determining antagonism, the trial court must consider the relevant facts and circumstances of the case including the pleadings, information disclosed by pretrial discovery, information and representations made during voir dire, and other information brought to the trial court's attention. *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 919 (Tex.1979).

■ This issue presents a question of law which we review de novo. *Id.* ("The existence of antagonism is not a matter within the trial court's discretion; it is a question of law whether any of the litigants aligned on the same side of the docket are antagonistic with respect to any issue to be submitted to the jury.").

### Analysis

■ We first reject appellees' argument that Holland waived the issue by failing to object to the trial court's allocation of jury challenges. Holland's counsel raised the issue before the parties made any challenges and argued against MHM's request for additional challenges, noting that he had not seen antagonism among the appellees. The record clearly reflects that the trial judge heard and considered Holland's opposition before ruling. Holland was not required to make an exception to the trial court's ruling. *See* TEX. R.APP. P. 33.1(c) (formal exception to trial court ruling not required to preserve complaint for appeal).

■ We conclude, however, that the trial court did not err. Before trial, the court heard motions by MHM and the Officers to designate responsible third parties. MHM's motion asserted numerous allegations against the Officers, including self-dealing with PCC's assets, "making PCC pay exorbitant compensation" to other entities controlled by the Officers, concealing aspects of PCC's financial condition, issuing financial statements that did not reflect the true financial condition of the company, participating in the filing of inaccurate and misleading financial statements to state regulatory bodies, failing to cooperate with regulators, concealing their wrongful acts, and other breaches of fiduciary duty. The Officers in turn moved to designate MHM, among others, as a responsible third party, alleging that any damages suffered by Holland were caused by the acts and omissions of MHM in performing audits of PCC. The trial court granted these motions before trial.

Although the voir dire did not reveal much antagonism among MHM and the Officers, MHM's counsel explained to the jury that the case involved claims that

MHM did not discover "improper business transactions being conducted by the [Officers]." The jury was also asked to apportion fault among MHM, the Officers, and others, an issue on which MHM and the Officers were antagonistic. *See Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 5 (Tex.1986) (antagonism existed where, among other factors, defendants denied they were at fault but each claimed the other was at fault); *Garcia,* 704 S.W.2d at 736. We conclude that the trial court did not err in determining that MHM and the Officers were antagonistic with respect to an issue of fact that the jury was to decide. *See Garcia,* 704 S.W.2d at 736. We resolve Holland's third issue against her.

Because we have overruled Holland's issues regarding jury misconduct and peremptory challenges, we affirm the trial court's judgment as to MHM. We now turn to the remaining issues in Holland's appeal and the Officers' cross-appeal.

## STATUTE OF LIMITATIONS

First, we consider the Officers' cross-appeal asserting that Holland's claims for breach of fiduciary duty were barred by the four year statute of limitations as a matter of law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(5) (West 2002) (stating breach of fiduciary duty subject to four-year limitations period); TEX.R.APP. P. 43.3; *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.,* 995 S.W.2d 675, 677 (Tex.1999) (appellate court should first address issues that require rendition). The Officers contend that the trial court erred by denying their motions for directed verdict and for judgment notwithstanding the verdict on their statute of limitations defense.

## Applicable Law and Standard of Review

The statute of limitations is an affirmative defense, and a defendant bears the burden to plead, prove, and secure findings to support its affirmative defense. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988); *Prestige Ford Garland Ltd. P'ship. v. Morales,* 336 S.W.3d 833, 836 (Tex.App.-Dallas 2011, no pet.). This burden includes establishing when the plaintiff's cause of action accrued. *Prestige Ford,* 336 S.W.3d at 836. If the jury is not asked to determine when the cause of action accrued for purposes of supporting a limitations defense, the defense is waived unless the date of accrual was conclusively established under the evidence. *Id.* For the Officers to prevail on this issue, the evidence must conclusively establish the Officers' right to a judgment on their affirmative defense. *See Gibson v. Ellis,* 126 S.W.3d 324, 329 (Tex.App.-Dallas 2004, no pet.); *Cain v. Pruett,* 938 S.W.2d 152, 160 (Tex.App.-Dallas 1996, no writ). In our review, we consider the evidence in the light most favorable to the ruling and indulge every inference that would support it. *See City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We review all the evidence and must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *Id.* at 827.

The Officers did not obtain jury findings regarding the accrual dates of Holland's breach of fiduciary duty claims. *See Wohlfahrt v. Holloway,* 172 S.W.3d 630, 638–39 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). Consequently, the Officers must demonstrate that the accrual dates of Holland's claims were conclusively established. *See Woods,* 769 S.W.2d at 518; *Wohlfahrt,* 172 S.W.3d at 638–39. If the dates of accrual were not "conclusively established under the evidence," then the Officers' limitations defense is waived. *Prestige Ford,* 336 S.W.3d at 836.

## Analysis

Holland alleged multiple and distinct breaches of fiduciary duty by the Officers.[3] But the jury charge contained only one question concerning all of those alleged breaches of fiduciary duty, and it did not inquire about or identify any specific acts or events as the bases for the claims.[4] *Cf. Fleet v. Fleet,* 711 S.W.2d 1, 2 (Tex.1986) (stating that jury charge submitted all allegations of breach of fiduciary duty in one issue, but with each different act lettered "A" through "K"); *First City Nat'l Bank of Paris v. Haynes,* 614 S.W.2d 605, 608 (Tex.Civ.App.-Texarkana 1981, no writ) (stating that "[a] separate inquiry in checklist fashion as to specific acts of ... breaches of duty, ... in the manner submitted in this case, is perfectly proper"). Consequently, we do not know what conduct constituted the basis of the jurors' answer to the question concerning the Officers' breach of fiduciary duty:

Requested Question No. 4

3. In Holland's live pleading, she alleged that the Officers "caused damages to the insurance company, policyholders, and creditors through ... breaches of their fiduciary obligations." She described the alleged breaches as follows:

> The [Officers] transferred assets from the company to themselves or their controlled entities and authorized self-dealing transactions in violation of their legal duties to be loayl to and act for the benefit of the company.
> The [Officers] harmed PCC by issuing financial statements that did not reflect the true financial condition of the company nor disclose the inappropriate self-dealing with the Managing General Agent and other activities. [They] acted to conceal their wrongful acts and mislead policy holders, regulators, outside directors, and any other persons who had the ability to protect the assets of the company, the interests of policy holders, the state guaranty associations, and the interests of PCC's creditors....
> The [Officers] did not act for the benefit of the company's interests, the insureds'

Did those persons named below comply with their fiduciary duties to Plaintiff?

Instructions:

Because they were officers and directors of PCC, Miller, Lovelace and Lee owed Plaintiff a fiduciary duty. To prove Miller, Lovelace, and Lee complied with their fiduciary duty to Plaintiff, they must show:

(a) the transactions in question were fair and equitable to Plaintiff;

(b) Defendants made reasonable use of the confidence that Plaintiff placed in them;

(c) Defendants acted in the utmost good faith and exercised the most scrupulous honesty toward Plaintiff;

(d) Defendants placed the interests of Plaintiff before their own, did not use the advantage of their position to gain a benefit for himself at the

interests, or the creditors' interests, but instead acted completely to the detriment of PCC. The [Officers] had adverse interests to those of the company.

The [Officers] intentionally and willfully took actions to delay the efforts of Plaintiff to marshal the assets of the receivership through a variety of actions ranging from encouraging former company employees not to cooperate with the Receiver to actively spoliating computer records, documents, and other evidence of the financial affairs of the company and the affiliates of PCC.

The [Officers], aided by MHM, caused PCC to enter into various arrangements with PGA that contributed to PCC's massive losses, allowed the [Officers] to engage in self-dealing with PCC's assets to the benefit of [Officers] through PGA, and concealed aspets of the financial condition of PCC from persons who were not self-dealing or participating in [the Officers'] active wrongdoing.

4. No party challenges the appropriateness of this jury charge.

expense of Plaintiff, and did not place themselves in a position where their self-interest might conflict with their obligation as a fiduciary; and

(e) Defendants fully and fairly disclosed all important information to Plaintiff concerning the transaction.

. . .

Answer "Yes" or "No" for each of the following:

| | |
|---|---|
| Richard Miller: | No |
| Robert Lee: | No |
| Charles Lovelace: | No |

The Officers contend that, as a matter of law, Holland's causes of action for breach of fiduciary duty accrued more than four years before she filed suit on March 1, 2004. They contend that Holland's experts testified about alleged wrongdoing, such as taking excessive commissions, manipulating claims, and making misrepresentations about reinsurance, occurring as early as 1998 and 1999; that Holland's damages models were based on the theory that MHM should have discovered the Officers' wrongful conduct by 1999; and that PCC would have been shut down in September 1999. The Officers contend that this evidence conclusively established that any legal injury to Holland occurred by 1999, that the statute of limitations began to run at that time, and that any alleged wrongdoing occurring after 1999 was barred because the legal injury occurred by 1999. They rely on cases stating the rule that "a cause of action generally accrues when a wrongful act causes some legal injury, regardless of when the plaintiff learns of the injury, and even if all resulting damages have not yet occurred." *Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 226 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (citing *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996)). And they cite

*Seureau* for the proposition that "[w]hen the defendant's conduct produces a legal injury, however slight, the cause of action accrues and the statute of limitations begins to run." *Id.* (citing *Childs v. Haussecker,* 974 S.W.2d 31, 41 n. 7 (Tex.1998)).

Holland counters by arguing that the record includes evidence that the Officers committed acts constituting breaches of their fiduciary duties after March 2000, which was within four years of the date the lawsuit was filed. For example, Holland offered evidence that in 2000 and 2001, the Officers used the PGA entity to obtain over $10 million in commissions to which PGA and the Officers were not entitled; that PCC's financial statement for the year ending December 31, 2000, for which the Officers were responsible, did not reflect PCC's true financial condition; and that in early 2002 before the OID instituted receivership proceedings, the Officers removed documents and computer equipment and withheld documents from the conservator.

The Officers argue, however, that those allegations of wrongdoing after 2000 are irrelevant because Holland's damages calculations were premised on the contention that PCC should have been shut down by regulators in September 1999. They contend that limitations had already run on the claims for breach of fiduciary duty that were the basis for Holland's damages models, and, as a result, no recovery is possible. But the record does not support the Officers' argument. Instead, it shows that Holland's experts testified that the alleged breaches occurring both before and after 2000 were the cause of the damages to PCC.

█ Holland also argues that she pleaded the application of the discovery rule. The discovery rule defers accrual of a cause of action until the plaintiff knew or

in the exercise of reasonable diligence should have known of the wrongful act and resulting injury. *S.V.*, 933 S.W.2d at 4. Courts have held that the discovery rule applies to breach of fiduciary duty claims because plaintiffs are entitled to rely on those who owe them special duties and those claims are generally considered "inherently undiscoverable." *Id.* at 6, 8. Holland offered evidence that she did not discover, and could not have discovered, the facts giving rise to her breach of fiduciary duty claims before March 1, 2000, four years before she filed suit. For example, one of her experts, Mark Tharp, testified that until forensic accounting was performed after PCC went into receivership, there was no reason to believe PCC's financial difficulties were caused by the wrongful conduct of the principals of the company. He testified that the receiver was "getting a pretty good handle on the financial position of the company" in the fourth quarter of 2003, prior to filing the petition in March 2004. He also stated that before then there was "absolutely no evidence" that there was any reason to believe PCC had been wrongfully injured prior to March 2002. In addition, Holland notes that of the five events the Officers claim "would have put plaintiff on notice inquiry," four occurred after March 1, 2000.

▇▇▇ The Officers acknowledge that the discovery rule defers accrual of a cause of action, but contend that Holland may not rely on the discovery rule to defeat the limitations bar because she did not request a jury finding on the application of the discovery rule. As with the limitations defense, the party asserting the discovery rule bears the burden of proving and se-

curing favorable findings thereon, or waives the complaint on appeal. *Woods,* 769 S.W.2d at 518. Here, however, because the Officers did not obtain findings to support their limitations defense, our inquiry is whether the accrual dates were "conclusively established under the evidence." *Prestige Ford,* 336 S.W.3d at 836. An accrual date is conclusively established "[i]f reasonable minds could not differ about the conclusion to be drawn from the facts...." *NETCO, Inc. v. Montemayor,* 352 S.W.3d 733, 738 (Tex.App.-Houston [1st Dist.] 2011, no pet.). "Generally, a cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy." *Trousdale v. Henry,* 261 S.W.3d 221, 233 (Tex.App.-Houston [14 Dist.] 2008, pet. denied) (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998)).

▇▇▇ As we explained, there was evidence in the record that Holland did not discover and should not have discovered pre–2000 alleged breaches until after 2000, which was within the limitations period. And there was other evidence in the record that other alleged breaches occurred after 2000, which would also have been within the limitations period. There was evidence that some of the alleged breaches could not have accrued prior to 2000 because the conduct supporting those allegations did not occur until after 2000.[5] On this record, the Officers did not prove conclusively that all of Holland's breach of fiduciary duty claims were barred.

The Officers also state that, although the lawsuit was filed on March 1, 2004, Holland did not serve Miller and Lee with

---

**5.** For example, as we noted before, Holland alleged that the Officers breached their fiduciary duties to PCC after the company was placed in receivership, which was in 2002,

through the spoliation of company "computer records, documents and other evidence of the financial affairs of the company and the affiliates of PCC."

process until February 2005. They argue that any cause of action accruing before 2001 would be barred. They contend that diligence in service was a fact issue on which Holland bore the burden of proof and she failed to request a jury finding on the issue. Diligence in service, however, is not an issue unless limitations ran before the date Miller and Lee were served. *See, e.g., Ashley v. Hawkins,* 293 S.W.3d 175, 179 (Tex.2009) ("If a party files its petition within the limitations period, service outside the limitations period may still be valid if the plaintiff exercises diligence in procuring service on the defendant."); *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 830 (Tex.1990) (discussing effect of change in accrual rule on necessity of showing diligence in service). As noted above, the Officers did not establish as a matter of law that Holland's claims for breach of fiduciary duty were barred by limitations; in fact, there was evidence that alleged breaches occurred as late as 2002. Suit was filed and service was accomplished within four years of 2002. Because Miller and Lee did not establish as a matter of law that limitations ran before they were served with process, diligence in service was not an issue for the jury. *Id.*

As a result, and considering the evidence in the light most favorable to the trial court's rulings and indulging every inference that supports the rulings, we conclude that the trial court did not err by denying the Officers' motions for directed verdict and for judgment notwithstanding the verdict. We resolve the Officers' cross-appeal against them.

#### DAMAGES

In her fourth issue, Holland contends that the trial court erred by denying her motion for new trial because the jury's damages award in response to question 7 of the jury charge was "manifestly too small" and was not supported by factually sufficient evidence. The jury answered question 7 as follows:

**Question 7:**

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff for its actual economic or pecuniary loss, if any, resulting from the occurrence in question? . . .

Answer in dollars and cents for damages, if any, that

**Were sustained in the past:** *$5,000,000 (five million)*

**In reasonable probability will be sustained in the future:** *$5,000,000 (five million).*

### Applicable Law and Standard of Review

As a general rule, the jury has broad discretion to award damages within the range of evidence presented at trial, as long as a rational basis exists for its calculation. *Khorshid, Inc. v. Christian,* 257 S.W.3d 748, 760 (Tex.App.-Dallas 2008, no pet.) (*citing Mayberry v. Tex. Dep't of Agric.,* 948 S.W.2d 312, 317 (Tex.App.-Austin 1997, writ denied)). The jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear. *Id.* (citing *First State Bank v. Keilman,* 851 S.W.2d 914, 930 (Tex.App.-Austin 1993, writ denied)). The fact that there is nothing in the record to show how the jury arrived at a specific amount is not necessarily fatal to the verdict. *Id.* (citing *Mayberry,* 948 S.W.2d at 317). Instead, when the evidence supports a range of awards, as opposed to two distinct options, an award of damages within that range may be an appropriate exercise of the jury's discretion. *Id.* But where there is no rational basis for the calculation, the jury's finding should be set aside. *See Keilman,* 851 S.W.2d at 930–31. A jury may not arbitrarily assess an amount nei-

ther authorized nor supported by the evidence presented at trial. *Id.* at 930.

## Relevant Evidence

The evidence of damages in the record consisted of testimony from Holland's two expert witnesses, Tharp and Edward Buttner, and MHM's expert witness, Charles Lundelius. Buttner testified that PCC should have been closed down by September 1999 and that the state regulators would have done so absent MHM's negligence in preparing its audits. Buttner calculated the activity on policies issued after this date and testified that those policies would not have been written if PCC had been closed down at the appropriate time. He testified that he determined a value for PCC as of September 1999 and as of March 2002, when PCC was actually closed down. The difference between those two values was, in Buttner's opinion, the amount of damages incurred. Buttner's damages calculation was $46.2 million, consisting of $40.2 million in past damages, and $6 million in future damages. Tharp applied a similar methodology, calculating damages from policies that in his opinion should not have been written, but concluded that Buttner's damages number was too low because Buttner's calculations were too conservative. After applying his own methodology, Tharp's damages calculation was $52,566,000, including approximately $43.5 million for past damages and $9 million for future damages.

MHM's expert, Lundelius, testified that PCC sustained no damages at all because PCC was not insolvent. He concluded that even though there had been a decline in PCC's value, as long as the value was positive, only the individual owners of PCC would suffer any loss. He disagreed with the methodology used by Buttner and Tharp and testified that, even assuming the methodology was appropriate, Buttner and Tharp included many items in calculating the insolvency that were not attributable to MHM. According to Lundelius, Buttner's calculation of an $81 million insolvency for year-end 2005 should have been reduced to an insolvency no greater than about $2.6 million, and Tharp's calculation of a $70.5 million insolvency for 2007 should have been reduced to $3.5 million.

Lundelius questioned a number of elements in Buttner's and Tharp's damages calculations, including the start date and end date for the calculations as well as amounts that should not have been attributed to MHM. As Lundelius explained on cross-examination, the reductions were not to the damages Holland was seeking, but to "the beginning points for various loss calculations." He explained that he understood the $81 million and $70.5 million insolvency numbers were not the damages Holland sought from MHM, and his calculations showing reductions to those numbers were to demonstrate "that there is a vast difference between the approaches" the two experts used. Lundelius specifically stated that his calculations could not be substituted in Buttner's or Tharp's formulas, explaining, "there you are mixing apples and oranges because these—these amounts over here were done with contemporaneous data. And you'd be taking contemporaneous data and comparing it with this look-back method data on your—as your end point for damages. That wouldn't be right."

## Analysis

 It is apparent from the verdict that the jury believed the Officers did not comply with their fiduciary duties and that PCC suffered some amount of damage from that conduct. The damages sought by Holland, however, were premised upon PCC's insolvency. And a determination of the insolvency of an insurance carrier is

dependent upon evaluating elements such as amounts set aside in reserve for potential claims, applicable regulations, and other matters not within the experience or common knowledge of jurors. Consequently, the jury could not determine what amount of damages PCC suffered in this case without expert testimony. As explained in *Perry v. Texas Municipal Power Agency*, 667 S.W.2d 259, 264 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.),

> The testimony of experts is called for whenever peculiar skill and judgment applied to a particular subject are required in order to explain results or trace them to their causes." *Montgomery Ward & Co. v. Levy*, 136 S.W.2d 663 (Tex.Civ.App.-Fort Worth 1940, writ dism'd, jdgmt. cor.).... Expert opinions are admitted in evidence on the theory that the expert, by reason of study, has special knowledge which jurors do not possess, and is therefore better able to draw conclusions from facts. *Loper v. Andrews*, 404 S.W.2d 300 (Tex.1966); *Ervin v. Gulf States, Inc.*, 594 S.W.2d 134 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.).

 Of course, the jury was free to accept or reject all or any portion of the testimony of any expert it did not find to be credible. *See Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 772 (Tex.App.-Dallas 1993, writ denied) ("It is particularly within the jury's province to weigh opinion evidence and the judgment of experts.") (citing *Pilkington v. Kornell*, 822 S.W.2d 223, 230 (Tex.App.-Dallas 1991, writ denied)). The jury could not, however, arbitrarily assess an amount that was not authorized or supported by the evidence presented at trial. *See Keilman*, 851 S.W.2d at 930–31 (stating "a jury may not 'pull figures out of a hat'; a rational basis for calculation must exist").

The Officers argue that *Keilman* is distinguishable because in that case, which involved authorized interest on a promissory note, the jury was presented with only two possible answers for the damages issue, rather than a range. As the Officers point out, the same court that decided *Keilman* has distinguished it on this ground. *See, e.g., Pleasant v. Bradford*, 260 S.W.3d 546, 560 (Tex.App.-Austin 2008, pet. denied) ("Central to our conclusion in *Keilman* was the fact that the 'evidence presented by both the [parties] provided a relatively precise method for calculating unauthorized interest.' ... We have distinguished *Keilman* in subsequent opinions where the evidence supports a range of damage options rather than an either-or situation."). In *Pleasant*, the evidence included five different appraisals and two different purchase prices for the value of a home, as well as testimony about prices per square foot. *Id.* at 560–61. The court concluded that the evidence presented the jury with a range of possible reasonable values, and the jury's finding was within that range. *Id.* The court in *Pleasant*, however, noted the same principles articulated in *Keilman*—that a jury cannot award an amount neither authorized nor supported by the evidence at trial, and a rational basis must exist for the calculation of damages. *Id.* at 559.

The court in *Pleasant* also cited *Parallax Corp. v. City of El Paso*, 910 S.W.2d 86, 91–92 (Tex.App.-El Paso 1995, writ denied), for the proposition that a jury can depart from expert valuations if other evidence at trial is sufficient for the jury to do so. Here, however, there was no other evidence at trial to support the jury's verdict, and the Officers point us to none. Nor do the Officers argue that any basis exists in the evidence to support the verdict. Rather, they argue in essence that the jury may assign any number as dam-

ages, provided that number is less than the high end testified to by the experts.

In summary, the jury found that the Officers did not comply with their fiduciary duties to PCC, and PCC suffered some amount of damage from that conduct. But the jury awarded amounts of damages with no support in the record. As a result, we conclude that there is no rational basis for the jury's award and that the jury's award of damages is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). Because there is insufficient evidence to support the jury's award of damages, we reverse the trial court's judgment as to the Officers and remand the cause for a new trial. *See* TEX.R.APP. P. 44.1(b); *Estrada v. Dillon,* 44 S.W.3d 558, 562 (Tex.2001) (per curiam) (where liability is contested, court of appeals may not order a separate trial solely on unliquidated damages).

### PROPORTIONATE RESPONSIBILITY

In Holland's second issue, she argues that the trial court erred by submitting OID as a responsible third party in question six of the jury charge. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (West 2008). Question six asked the jury to determine the proportionate responsibility of all parties. In answering the question, the jury found OID's negligence was responsible for 15% of the damages sustained by PCC.[6] Holland contends that the trial court should not have submitted OID as a responsible third party in the proportionate responsibility question because there was no evidence OID was negligent, no evidence OID owed a duty to plaintiff, and OID had sovereign immunity. The Offi-

cers contend that OID had a duty not to act negligently, there was evidence it breached that duty, and sovereign immunity does not preclude a party from being a responsible third party under section 33.004.

The submission of OID as a responsible third party in the proportionate responsibility question was based on the jury's finding that OID was negligent. The jury found that the negligence claim was barred by limitations, and we have overruled all of Holland's issues on appeal that would have required us to reverse the jury's negligence finding. No one contends on appeal that OID owed a fiduciary duty to any party in this case. Because the question of whether OID was negligent does not impact the resolution of the breach of fiduciary duty claims, and, on this record, no basis exists for submitting proportionate responsibility on remand, we do not need to decide this issue. *See* TEX.R.APP. P. 47.1 (stating court of appeals must issue written opinion that addresses every issue raised and necessary to final disposition of appeal).

### ERISA PREEMPTION

██ In issue five, Holland argues that the trial court erred by granting the Officer's motion for judgment notwithstanding the verdict on the issue of whether the jury's damages award should be reduced by $4.2 million based on ERISA preemption. We review the trial court's ruling under a legal sufficiency standard. *Hunter v. PriceKubecka, PLLC,* 339 S.W.3d 795, 806–07 (Tex.App.-Dallas 2011, no pet.). A judgment notwithstanding the verdict is proper when (1) the evidence is conclusive and one party is entitled to

---

**6.** The jury had previously determined in answer to question three that OID was negligent.

judgment as a matter of law, or (2) a legal principle precludes recovery. *Id.* at 806.

The Officers filed a motion for judgment notwithstanding the verdict arguing that Holland did not have standing to sue for damages under ERISA because she was not a plan participant or beneficiary. *See* 29 U.S.C. § 1132(a)(1)(B) (stating ERISA plan participant or beneficiary may bring civil action to recover benefits due under plan). Holland argued that she did not sue for benefits due under an ERISA plan, but rather sued for damages caused by mismanagement of the company, which included instituting an ERISA line of business. The trial court granted the motion and subtracted $4.2 million from the jury's $10 million damages award.[7]

■ Even if the $4.2 million in damages were for benefits due under an ERISA plan and were not recoverable by Holland, the Officers did not present any evidence that the jury included those damages in its award of past damages. As we explained, the evidence of past damages from Holland's perspective was in excess of $35 million. The evidence of past damages from the Officers' perspective was zero. The jury awarded $5 million in past damages, but the verdict was general with regard to damages and did not itemize what it considered in assessing the $5 million in past damages. The evidence included testimony that PCC suffered past damages of over $35 million for state guaranty association losses, high net worth losses paid by state guaranty associations then refunded, and ERISA unpaid losses. Consequently, there is no basis in the record for concluding that the $5 million in past damages included the $4.2 million in alleged ERISA damages, and the trial court erred by reducing the jury's dam-

ages award. *See Washington Mut. Bank v. Houston Windcrest West Road I, L.P.,* 262 S.W.3d 856, 862 (Tex.App.-Dallas 2008, pet. denied). We resolve issue five in appellant's favor.

### CONCLUSION

We affirm the trial court's judgment as to MHM. We reverse the trial court's judgment as to the Officers and remand the cause to the trial court for a new trial.

---

7. Expert witness Tharp testified that he attributed $4.2 million of the damages to PCC to the ERISA business.