

# NUMBER 13-12-00100-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SAMUEL CREGO,                                                          Appellant,

v.

GUILLERMO LASH &
JOHN HOYSICK,                                                          Appellees.

### On appeal from the 404th District Court of
### Cameron County, Texas.

# MEMORANDUM OPINION ON REHEARING

### Before Justices Rodriguez, Garza and Perkes
### Memorandum Opinion by Justice Garza

We issued our original memorandum opinion in this case on December 19, 2013.

Appellant Samuel Crego filed a motion for rehearing. *See* TEX. R. APP. P. 49.1. Appellees

Guillermo Lash and John Hoysick filed a response to the motion. We deny the motion for

rehearing, withdraw our previous memorandum opinion and judgment, and substitute the

following memorandum opinion and judgment in their place.

This case involves loans between acquaintances to finance a failed real estate venture. A jury found that Crego breached two separate loan agreements: one, a promissory note with Lash, and two, an unwritten agreement with Hoysick. After the jury awarded damages and attorneys' fees, the trial court rendered judgment against Crego in favor of Lash for $52,584.25 and in favor of Hoysick for $50,000.00. The trial court also awarded appellees $33,745.00 in attorneys' fees plus costs, post-judgment interest, and conditional appellate attorneys' fees. By four issues, Crego argues that: (1) the trial court erred by conditioning his right to appeal on the posting of a bond in the amount of the judgment; (2) Lash and Hoysick's claims were barred by limitations; (3) alternatively, the trial court erred in refusing to submit the limitations issue to the jury; and (4) if either damage award is reversed, the attorneys' fees award should be reversed and remanded. We affirm.

## I. BACKGROUND

Crego, Lash, Hoysick, Ralph Burks, and Carlos Sarmiento met through their employment with Trico in Brownsville, Texas. In March 2004, Crego and Burks formed a management company, Crego and Burks Management Group, LLC ("the management company"), for the purpose of developing and managing real estate ventures.[1]

On July 1, 2004, Lash loaned Crego and Burks $80,000. The loan was evidenced by a promissory note, which provided for repayment in monthly installments over six months, with the final payment due January 1, 2005. The note was secured by real property located in Harlingen, Texas. Under the note, for the first six months, interest

---

[1] Crego testified that "Crego and Burks Management Group, LLC" was later renamed Westgate Village Homes, LLC.

was 3.3% per month on the first $50,000 and 1.6% on the remaining $30,000. The total principal and interest due on January 1, 2005 was $93,000.

It is undisputed that the loan was not repaid in January 2005. An invoice dated July 18, 2006 was admitted at trial. The invoice, from Lash to the management company, states that it is for the "[i]nvestment [l]oan on 7/1/05."[2] It further states, "Principal amount: $80,000.00 @ 14% per annum simple interest" and "Balloon Date 6/31/06." The "Amount" column shows $80,000.00 plus $11,200.00 in interest, for a total of $91,200.00. Crego testified that the $91,200.00 amount "was an agreed upon amount" between himself, Burks, and Lash. Crego testified that Lash was paid the $91,200.00 on October 31, 2006. Crego admitted that the amount repaid to Lash was less than the amount due under the terms of the note, but stated that Lash agreed to the amount in a "spirit of cooperation."

In August 2004, Hoysick and Sarmiento each provided the management company with $50,000 to facilitate the purchase and resale or development of an eight-acre property in Weslaco, Texas known as "Westgate Loop."[3] The terms of these transactions were not reduced to writing. It is undisputed that the $100,000 was used as "collateral" for a $575,000 bank loan to the management company for the purchase and development of Westgate Loop. According to Crego, the unwritten agreement was that Burks, Hoysick, and Sarmiento would each receive 22.5% of the profits from the resale or development project, with Crego receiving 32.5% of the profits. Crego testified that eight months later, around April 2005, the bank loaned the management company $425,000 to purchase the Westgate Loop property. Six or eight months after that, Sarmiento decided to withdraw

---

[2] Crego admitted that July 1, 2005 was a year later than the actual date of the loan, July 1, 2004.

[3] Crego denies that these funds were loans; rather, he contends they were "investments" in the development project. Crego testified that there was no date certain when Hoysick would receive a return on his $50,000.

from the venture. Crego testified that he returned Sarmiento's $50,000. The three remaining parties agreed to split the profits with each receiving thirty percent, and Crego receiving an additional ten percent.

Sarmiento testified that he loaned the management company $50,000. According to Sarmiento, the parties agreed that these funds, along with the $50,000 loaned by Hoysick, would remain untouched at the bank, the land would be resold at a substantial profit, and each would receive twenty-five percent of the profit from the resale. The agreed-upon interest on the loan was a percentage of profits upon resale. Later, after Crego began working for the management company full time, the percentage of profit changed to twenty percent each for Sarmiento, Lash, and Burks, and forty percent for Crego. Crego told Sarmiento that he expected to "flip" the property quickly because another buyer had already made an offer. After the management company turned down several offers and decided to develop the property, Sarmiento decided to withdraw from the venture and asked for the return of his $50,000. Over the course of two years, Sarmiento was repaid the $50,000, but was not repaid any interest. Sarmiento testified that when the plans changed from resale to development of the property, he felt that he was being invited to invest and decided not to do so.

Hoysick testified that he loaned the management company $50,000 in August 2004. The agreement was that when the property was resold, he would receive his $50,000 plus a percentage of the profits from the resale. Initially, the percentage of profit was twenty-five percent; later, the percentage changed to twenty-two-and-a-half percent, and still later, to twenty percent. Hoysick stated that he suggested to Crego that he also wanted to withdraw, but Crego said he did not have the funds to repay him. Crego told Hoysick that if he withdrew, he would not retain any interest in the project. Hoysick said

4

that Crego offered to pay him fourteen percent interest on repayment of the $50,000 if Hoysick withdrew. Hoysick was not ever repaid any amount. In January 2007, Crego told Hoysick that the bank had released the funds held in security. Hoysick gave Crego a transfer account number, but Crego refused to provide any repayment. Crego told Hoysick that the funds were used for other management company projects. Hoysick stated that he did not invest in Westgate Loop and did not know that his money was at risk.

On cross-examination, Hoysick was asked about a July 9, 2006 email that he sent to Crego in which he asked "to discuss the status of the apartment project" and "to review something in writing to document my relationship/investment with Crego and Burks." Hoysick stated that if he wanted out of the project, "there was one set of terms," but if the land sold or apartments were built, he would receive his original $50,000 plus a percentage of the profits. He stated that "[t]here was no specific date" when his money was to be returned; he would be repaid when either the land was sold or the apartment complex was built and sold. Hoysick expected to receive the return of his $50,000 plus a percentage of the profits within six months. If he withdrew from the project, he would not receive any profit, but would still receive fourteen percent interest on the loan. Hoysick stated that in January 2007, when the bank released the collateral funds, he should have been repaid.

In July 2007, Hoysick sent Crego an email in which he inquired about: (1) the "status of the subject project"; (2) the "status of bringing in additional investor(s)"; and (3) the "status of returning [his] initial $50k as originally agreed upon and now 6 months past due."

After the recession in 2008, Crego was unable to obtain refinancing from the bank

5

for the development. Eventually, he sold the property for the amount owed to the bank, approximately $520,000. Crego did not tell Hoysick when he sold the property. Eventually, in August 2009, Hoysick learned that the property had been sold when Burks filed for bankruptcy.

Lash testified that he loaned the management company $80,000 in July 2004. The repayment date on the loan was January 1, 2005. Lash testified that Crego drafted the promissory note. The note sets forth interest in the amount of $2,166.67 per month. When the note became due in January 2005, Crego said he was unable to repay the note. Crego repaid Lash $91,200 twenty-seven months later. Lash stated that the invoice showing "investment/loan" on July 1, 2005 was prepared by Crego, and the actual date of the loan was July 2004.

Lash testified that he loaned Crego an additional $50,000 in January 2006.[4] Lash made the second loan, even though he had not been repaid for the first, because he believed that if the management company failed, he may "lose everything." At the time of the second loan, Lash and Crego agreed that interest on the remaining balance of the $80,000 would be fourteen percent. Lash learned that Burks had left the management company when he received notice of Burks's bankruptcy filing.

Lash stated that Crego gave him the invoice and the $91,200 payment in November 2006. Lash stated that he asked for the rest of what he was owed, but Crego said he would have to wait for the rest of the money. Lash said the fourteen percent reflected on the invoice came from Crego and they did not discuss it.

## II. POSTING OF BOND

---

[4] The jury did not find that Lash made the $50,000 loan, and it is not at issue in this appeal.

By his first issue, Crego contends the trial court erred by including language in the judgment conditioning the appeal on Crego posting a bond in the amount of the judgment. Appellees respond that: (1) Crego failed to preserve any issue because he did not object to the judgment or move to modify it; and (2) the bond provision should be construed to set the amount of any supersedeas bond under section 52.006 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 52.006 (West 2008); TEX. R. APP. P. 24.

In January 2013, this Court denied Crego's motion to review the trial court's order conditioning the appeal on the posting of a bond. In our January 11, 2013 order, we rejected Crego's argument that the trial court intended the subject bond to be a supersedeas bond.

In any event, we conclude that the issue is now moot. Crego has not posted a bond and has not been prevented from appealing the judgment. Appellees have not requested dismissal of the appeal. We overrule Crego's first issue.

### III. LIMITATIONS

By his second issue, Crego contends that Lash's and Hoysick's claims accrued more than four years prior to their filing of the lawsuit and are therefore barred by limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.035(e) (West 2002) (providing that, if a note payable in installments is secured by a real property lien, the four-year limitations period begins to run on maturity date of last installment). Appellees respond that their claims are not barred by limitations because the claims are governed by the six-

year statute of limitations pursuant to section 3.118 of the Texas Business and Commerce Code. *See* TEX. BUS. & COM. CODE ANN. § 3.118 (West 2002).[5]

The statute of limitations is an affirmative defense, and a defendant bears the burden to plead, prove, and secure findings to support its affirmative defense. *Holland v. Lovelace*, 352 S.W.3d 777, 788 (Tex. App.—Dallas 2011, pet. denied). This burden includes establishing when the plaintiff's cause of action accrued. *Id.* If the jury is not asked to determine when the cause of action accrued for purposes of supporting a limitations defense, the defense is waived unless the date of accrual was conclusively established under the evidence. *Id.* Here, Crego did not obtain jury findings regarding the accrual dates for Lash's and Hoysick's claims. *See id.* Consequently, Crego must demonstrate that the accrual dates of Lash's and Hoysick's claims were conclusively established. *See id.* If the accrual dates were not conclusively established under the evidence, then Crego's limitations defense is waived. *See id.* Generally, a cause of action for breach of contract accrues upon breach. *Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex. 2006).

In our review, we consider the evidence in the light most favorable to the ruling and indulge every inference that would support it. *Id.* (citing *City of Keller v. Wilson*, 168

---

[5] In his reply brief, Crego argues that Lash should not be permitted to argue on appeal that the six-year statute of limitations applies because he failed to make this argument to the trial court. We disagree. Our review of the record shows that the statute of limitations issue was raised only very briefly at trial, without argument or citation to any statute, and without reference to a four-year or six-year limitations period. After the close of evidence, during a discussion of the jury charge, the trial court denied Crego's request for a jury question on the statute of frauds. Crego's counsel then stated, "[t]hen if it is performable within one year, then—then I think we have a statute of limitations argument, because all these agreements were entered into in 2004, 2005 and 2006." The trial court rejected the argument, stating that the statute of limitations begins to run only when a plaintiff conclusively knows that an agreement has been breached. Apparently referring to when Lash learned of the sale of the property, the trial court said, "When they found out that this land is sold and we didn't even know about it, I mean, there's a lot of variables to that, so—." The only other reference in the reporter's record is when Crego's counsel briefly recites the jury questions that he requested and the trial court denied. He characterizes some of those questions as involving the "statute of limitations" regarding various causes of action.

8

S.W.3d 802, 822 (Tex. 2005)). We review all the evidence and must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *Id.* (citing *City of Keller*, 168 S.W.3d at 827).

## A. Lash's Claim

Lash recovered under the $80,000 promissory note made on July 1, 2004. The loan was secured by real property. It is undisputed that the note was not paid by its maturity date, January 1, 2005. He filed suit on May 28, 2010.

Crego argues that Lash's claim for breach of a loan agreement is governed by the four-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.004(a)(3) (West 2002) (setting forth four-year limitations period for actions on debt), 16.035(e). Lash argues that, because he sued only to enforce payment on the promissory note, and not for foreclosure on the real property securing the note, his claim is governed by the six-year statute of limitations set forth in section 3.118 of the Texas Business and Commerce Code. *See* TEX. BUS. & COMM. CODE ANN. § 3.118 (stating generally that "an action to enforce the obligation of a party to pay a note payable at a definite time" must be brought within six years of the due date).

This Court addressed this issue in *Aguero v. Ramirez*, 70 S.W.3d 372, 375 (Tex. App.—Corpus Christi 2002, pet. denied). In that case, the plaintiff, Ramirez, sued Aguero to enforce payment of unpaid principal and interest on a real estate note secured by a deed of trust and a vendor's lien on real property. *See id.* at 373. We found that, "[w]here there is a debt secured by a note, which is, in turn, secured by a lien, the note and lien constitute separate obligations." *Id.* at 374. We held that, because Ramirez was "only suing to enforce payment on the promissory note," and was not suing to enforce the lien, the deed of trust, or seeking to foreclose on the real property, his claim was "an action to

9

enforce the obligation of a party to pay a note payable at a definite time" under the business and commerce code, and therefore, the six-year statute of limitations was applicable. *Id.* at 375; *see* TEX. BUS. & COM. CODE ANN. § 3.118; *see also Arlington v. McClure*, No. 02-06-296-CV, 2008 WL 755072, at *6 (Tex. App.—Fort Worth June 5, 2008, no pet.) (mem. op.). Here, Lash's $80,000 promissory note is a "note" within the meaning of the business and commerce code because it is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order" and is payable at a definite time. TEX. BUS. & COM. CODE ANN. § 3.104(a)(2), (e) (West 2002). It is a "promise" because it is "a written undertaking to pay money signed by the person undertaking to pay." *Id.* § 3.103(a)(12) (West Supp. 2011). The promissory note's maturity date is January 1, 2005. Lash's suit was filed May 28, 2010, within the six-year limitations period. We conclude that Crego did not establish that Lash's claim is barred by limitations and overrule Crego's second issue as it applies to Lash.

### B. Hoysick's Claim

Hoysick's $50,000 loan to the management company was evidenced by his check dated August 9, 2004. There was no written agreement regarding repayment provisions. Section 3.118 of the business and commerce code is not applicable to unwritten loan agreements. *See id.* §§ 3.103(a)(12), 3.104(e) (defining "promise" as a written undertaking to pay money and defining "note" as a promise). Accordingly, we conclude that the applicable statute of limitations is the four-year statute of limitations for a suit to collect a debt. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(3).

As noted, Crego's limitations defense is waived unless the evidence conclusively established the date that Hoysick's loan agreement was breached. *See Holland*, 352

10

S.W.3d at 788; *Barker*, 213 S.W.3d at 311. Crego argues that because there was no specific time to repay the loan, it was a demand note and the statute of limitations ran from the date the note was executed. According to Crego, limitations expired in August 2008, long before the filing of Hoysick's suit in May 2010. In support, Crego relies on *Manandhar v. Jamshed*. No. 02-11-00027-CV, 2011 WL 3835980, at *3 (Tex. App.—Fort Worth Aug. 31, 2011, no pet.) (mem. op.). In *Manandhar*, the Fort Worth Court of Appeals concluded that a document signed by the appellee/debtor acknowledging a $126,000 loan from the appellant was a demand note because the note did not specify a time for repayment. *Id.*

In general, a loan agreement which contains no time for repayment is payable on demand. *Nat'l Mar-Kit, Inc. v. Forrest,* 687 S.W.2d 457, 460 (Tex. App.—Houston [14th Dist.] 1985, no writ). The statute of limitations begins to run on a demand note on the date of making, unless demand is a condition precedent to suit on the note, in which case limitations begin to run on the date of demand. *Loomis v. Republic Nat'l Bank of Dallas*, 653 S.W.2d 75, 77 (Tex. App.—Dallas 1983, writ ref'd n.r.e.).

Here, however, we conclude that Hoysick's loan was not a demand loan because the evidence established that, although there was no date certain that Hoysick would receive repayment of his $50,000, the parties agreed that he would receive repayment when the Westgate Loop property was resold or when the bank released the funds held in security. Because repayment was tied to specific events—resale of the property or release of the funds—Hoysick's loan was not a demand loan. *See Fin. Freedom Sr. Funding Corp. v. Horrocks*, 294 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding notes were not demand notes because they contained conditions which created a readily ascertainable time for payment); *Maceo v. Doig*, 558 S.W.2d 117, 120

11

(Tex. Civ. App.—Austin 1977, writ ref'd n.r.e.) (holding oral promise to pay "in the summer" was sufficiently definite to support a finding of a binding extension of time for payment of a promissory note).

Hoysick testified that in exchange for his $50,000 loan, he was to receive the return of his $50,000 plus twenty-five percent of the profit when the Westgate Loop property was sold. Crego later reduced the percentage of profit due to Hoysick to twenty-two-and-a-half percent and later, to twenty percent. When asked at trial to identify the date his money was to be returned, Hoysick responded, "It was based on when the land sold, (A), or once the apartment complex was built and sold, (B). There was no specific date of when it would happen." If Hoysick withdrew from the project, he would not receive any percentage of the profit, but would receive fourteen percent interest on the loan. According to Hoysick, "the agreement was [he] could get out at any time." Hoysick was asked, "So there's no due date on your loan agreement. There was no exact date that the money was supposed to be paid back?" He responded, "Well, on the other hand, yes. Again, when the bank freed up the $50,000.00, which did happen in January of '07, when the bank freed up that money, I was supposed to receive it back." Crego informed Hoysick in January 2007 that the bank had released the $50,000. Hoysick requested the return of his money, but Crego refused.

Crego argues that the loan agreement was breached when Hoysick told Crego that he wanted to withdraw from the project. Assuming, without deciding, that the agreement was breached at that time, we find conflicting evidence regarding when that occurred. It is undisputed that Hoysick told Crego that he wanted to withdraw from the project after Sarmiento withdrew from the project. Sarmiento testified that he withdrew

12

from the project and asked for the return of his money in 2007. Hoysick testified as follows:

> Q [Crego's counsel]: And I think you said later on down the road you wanted out and you told Mr. Sarmiento, you called him and asked him what his thoughts were.
>
> A [Hoysick]: Correct.
>
> Q: When was that?
>
> A: Approximately, I would say, about a year later, roughly.
>
> Q: Give or take in 2005, more or less?
>
> A: A year, year and a half later.

Crego testified that Sarmiento asked for the return of his money around November 2005 or "a little bit after that." When asked if there was a date certain that Hoysick was supposed to get his money back, Crego said, "No. The only thing that was mentioned was if we were able to refinance and cash out, then some money would have been— have gone back to him, but we weren't allowed to." Even if we were to assume that the agreement was breached when Hoysick asked to withdraw from the project, the date of the breach is not conclusively established and Crego's limitations defense is waived insofar as it is based on Hoysick's withdrawal from the project. *See Holland,* 352 S.W.3d at 788.

We conclude that Crego breached the agreement either in January 2007 when the bank released the money and Hoysick demanded repayment or in 2008 when the Westgate Loop property was sold. Because Hoysick filed suit on May 28, 2010, we conclude that it was within the four-year limitations period. We overrule Crego's second issue as it applies to Hoysick.

13

## IV. JURY QUESTION

Alternatively, by his third issue, Crego argues that, to the extent there were disputed fact issues regarding when the loan agreement was breached, the trial court erred in refusing to submit questions on limitations to the jury. Specifically, Crego contends that the trial court erred in refusing to submit the following jury question regarding the loan agreement with Hoysick:

> As to the money you found was borrowed in the loan agreement you found in answer to Question No. _____, state the date on which it was loaned?
>
> Answer by giving one of these four types of answer: (a) stating a month, date, and a year, or (b) stating "no due date," or (c) stating "on demand" or (d) stating "depending upon a future occurrence."
>
> Answer:_____

Crego argues that although the question and instruction were "not perfect," they were "substantially correct" and were sufficient to put the trial court on notice that Crego was asserting a limitations bar. See TEX. R. CIV. P. 278 (stating that a failure to submit a jury question shall not be grounds for reversal unless the complaining party tendered it in writing in substantially correct wording to the trial court). As noted above, the discussion at the charge conference reflects that the trial court was aware that Crego raised the issue of limitations, and the trial court rejected the argument. Crego argues that the question was "substantially correct," although we note that it asked the jury to determine when the money was loaned, not when the loan agreement was breached. "The omission of an instruction is reversible error only if the omission probably caused the rendition of an improper judgment." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). We have already determined that Hoysick's claim was not barred by limitations because the loan agreement was breached either in January 2007 when the bank released the funds or in

14

2008 when the Westgate Loop property was sold. The trial court's failure to submit a jury question regarding when Hoysick made the loan could not have caused the rendition of an improper judgment. *See id.*

We overrule Crego's third issue.

## V. ATTORNEY'S FEES

By his fourth issue, Crego argues that if we reduce the damage award to either Lash or Hoysick, we should remand the attorney's fees issue for recalculation. Because we have not reversed or reduced either damage award, we need not address this issue. We overrule Crego's fourth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
27th day of March, 2014.

15