# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-15-00025-CV

**Appellants, Lakeway Regional Medical Center, LLC and
Surgical Development Partners, LLC// Cross-Appellant,
Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC**

**v.**

**Appellee, Lake Travis Transitional LTCH, LLC
n/k/a Lake Travis Specialty Hospital, LLC// Cross-Appellees,
Lakeway Regional Medical Center, LLC; Surgical Development Partners, LLC;
Brennan, Manna, & Diamond, LLC; and Frank T. Sossi**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-12-000983, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## MEMORANDUM OPINION

We withdraw our opinion and judgment dated July 1, 2016, and substitute the following in its place. We overrule the motion for rehearing filed by appellee and cross-appellant Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("Lake Travis"). The Court also overrules Lake Travis's motion for en banc reconsideration

Appellants Lakeway Regional Medical Center, LLC ("Lakeway") and Surgical Development Partners, LLC ("SDP") (collectively, "appellants") appeal from the judgment against

them in favor of Lake Travis.[1]  Lake Travis filed a cross-appeal against Lakeway, SDP, and additional cross-appellees Frank T. Sossi, the attorney who represented Lakeway in the negotiations that led to this litigation, and his law firm, Brennan, Manna, & Diamond, LLC (collectively, "the attorneys").  We reverse the trial court's judgment and render judgment that Lake Travis take nothing on its claims against appellants.

## Factual Background

In 2004, Robert Berry and Keith McDonald started planning a long-term acute care hospital[2] that would be known as Lake Travis Specialty Hospital.  The hospital was to be 57,000 square-feet in size and was to have forty-six beds.  In 2007, they obtained $21 million in financing by way of a ground lease with HCN Interra Lake Travis LTACH, LLC, which was a joint venture between HCN Interra and Health Care REIT, Inc.  Shortly before the lease was signed, Berry and McDonald created the Lake Travis legal entity, which entered into the lease as tenant.  Construction began in 2008.  However, in May 2009, in response to legislative action, Berry and McDonald decided to operate Lake Travis as a general acute care hospital.  At that point, HCN Interra started to have concerns about Berry's and McDonald's lack of experience with general acute care facilities.

---

[1]  The legal entity was initially called Lake Travis Transitional LTCH, LLC and is now known as Lake Travis Specialty Hospital, LLC.  References to "Lake Travis" refer to the legal entity.

[2]  Patients in a long-term acute care hospital stay more than twenty-five days on average. Patients in general acute care hospitals (also known as short-term acute care hospitals) stay fewer than six days on average. Berry and McDonald had substantial experience with long-term acute care hospitals but did not have experience in general acute care hospitals. Berry and McDonald planned Lake Travis to open as a long-term hospital initially and then transition into a general acute care hospital and to obtain a "general acute care hospital provider number" from Medicare.

In 2008, while Lake Travis was proceeding with construction, three doctors and a businessman formed Lakeway with the intent of opening a general acute care facility in the same general area that would encompass 244,000 square feet and have 106 beds. Lakeway hired SDP for assistance with obtaining financing and in opening the hospital. Sometime before mid-April 2009, Lakeway started applying for HUD Section 242 Mortgage Insurance, which is intended to "assist the provision of urgently needed hospitals" for care of acutely ill patients.[3] *See* 12 U.S.C. § 1715z-7(a). On April 16, 2009, HUD informed Lakeway that it had conducted a preliminary review and had identified no problems that would stop HUD from proceeding to a pre-application meeting, stated that Lakeway had to submit a complete application within one year, and assigned Robert Deen to be the project's HUD Account Executive. Deen's role was to "lead the team that will review the application for mortgage insurance" and to be Lakeway's contact person at HUD.

Meanwhile in 2009, Congress began discussing banning physician-owned hospitals, and Lakeway began exploring contingency plans that would allow it to open its facility before the ban took effect in 2010. Sossi, Lakeway's attorney, then approached a business contact who worked for Health Care REIT to ask about the Lake Travis facility and whether Lakeway might be able to use that facility as a first campus so that Lakeway might avoid the ban on doctor-owned structures. During those conversations, Sossi learned that Health Care REIT had concerns about

---

[3] *See generally* 12 U.S.C. § 1715z-7 ("Mortgage insurance for hospitals"); 24 C.F.R. §§ 242.1-.93 ("Mortgage Insurance for Hospitals"). Part of the HUD review process involves "a determination of the market need" for the hospital and whether the area is considered underserved by current facilities and services, which requires evaluation of current facilities, the number and percentage of any excess beds, and demographic projections. 24 C.F.R. § 242.16(a)(1). "Generally, Section 242 insurance may support start-up hospitals or major expansions of existing hospitals only if existing hospital capacity or services are clearly not adequate to meet the needs of the population in the service area." *Id.*

Berry's and McDonald's experience and that HCN Interra was hoping to replace Lake Travis as tenant in the project. Lakeway decided to explore whether the Lake Travis facility, which was already under construction, could serve as its initial facility while its larger facility was built.

Sossi examined the Lake Travis construction site in March 2009 and testified that this informal visit, combined with his past work on hospital projects and information he found online about the Lake Travis project, raised his concerns about parking, safe ambulance and patient access to the facility, electrical and heating/air conditioning [HVAC] issues,[4] and estimated costs to build and equip.[5] Sossi testified that he discussed his initial concerns with Lakeway's architects before the parties began formal negotiations.

In May 2009, SDP and Lake Travis signed a confidentiality agreement so that SDP could start due-diligence work on behalf of Lakeway. In September 2009, SDP, Berry, and McDonald signed a "Letter of Intent for the Acquisition of the Lakeway Hospital Lease" ("Letter of Intent"); SDP signed as Lakeway's agent. The Letter of Intent was intended "to indicate SDP's interest in the Project," defined as Lakeway's acquisition of the Lake Travis lease, use of the facility as an initial campus, and later use of the facility as a satellite location after its main campus was completed, and to set "ground rules" for the exchange of information related to the Project. The

---

[4] A long-term care facility has different HVAC and power needs than a general acute care hospital. In a general acute care hospital, different kinds of rooms require different pressure and temperature control systems, the hospital accrediting body has "infection control issues" related to HVAC systems, many pieces of hospital equipment require high levels of power, and a general acute care hospital has to have emergency generators in case of a power outage.

[5] A February 2009 newspaper article reported that the Lake Travis facility would cost $24 million to build and between $5 million and $7 million to equip, and Sossi testified that the price per bed came out to about $500,000 before any retrofitting costs were considered.

4

parties agreed to an extendable forty-five day period of negotiations and evaluation, and while the Letter of Intent was in effect, Berry and McDonald agreed not to enter into negotiations with another party for the assignment of the lease, and Lakeway agreed not to "enter into negotiations with any third party for the use of any site, other then [sic] the intended [Lakeway] main campus site, as an alternative or satellite facility." The parties also agreed "not to share any information with third parties gained in the negotiation and development process for the Project or to independently use any proprietary information of the other Party in any discussions or negotiations regarding this Project with third parties after the acceptance of this Letter of Intent." "Proprietary information" was defined as "all information disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner," with certain specific exceptions, and was only to be used to evaluate the feasibility of the Project.

Section 2 of the Letter of Intent stated that Lakeway "will assume the existing Lease between [Lake Travis] and [HCN Interra] and become the tenant under the Lease." Section 2 also stated that upon closing of the assignment of the lease, Lakeway would refund to Berry and McDonald the deposits and other reasonable costs associated with developing the facility (about $6.4 million in total) and would pay Berry and McDonald an additional $1.5 million lump sum payment. Section 3 stated that the terms of Section 2 were subject to full and formal approval by Lakeway's board, HCN Interra's approval, a due-diligence process to ensure the facility could be used as contemplated, Lakeway's ability to obtain financing, and "the mutual development of definitive documents that fully reflect the intention of the Parties expressed in this Letter of Intent."

In October 2009, Lakeway's architects produced a report raising concerns about Lakeway's possible use of the Lake Travis facility ["the PSP Report"], including:

5

- Inadequate parking. Applicable building and licensing codes required one space per daytime employee and one space per bed, resulting in a projected need for 255 spaces, as opposed to projected 114 spaces.

- Accessibility. The drawings provided to the architects did not reflect whether there was an accessible route from parking, public loading zones, and public streets. Similarly, none of the rooms were designed to meet applicable accessibility standards, and codes required ten percent of the rooms to be accessible. Finally, bathrooms and toilet areas were "noncompliant with accessibility requirements."

- Engineering and maintenance issues. The plans would have to be changed to provide separate space for general maintenance, a maintenance shop, "biomedical maintenance," housekeeping space, and laundry space.

- Sterility and cleanliness concerns. The current location of the "body holding" area was not appropriate, sinks would have to be added to numerous areas, and an additional "isolation room" was required.

- Equipment-related issues. The plans would have to be modified to meet requirements for various equipment (mammography machines, CT scanner, hyper baric chamber, etc.).

The costs to remodel the existing Lake Travis facility were estimated at about $1.5 million.

On March 17, 2010, HUD issued a commitment approving financing for Lakeway's facility as originally planned. On March 22, 2010, Sossi sent Lake Travis's representative an email stating that Lakeway had decided not to acquire the Lake Travis lease due to concerns about "what to do with the facility after the opening of [Lakeway's main campus] as well as any issues related to HUD delaying or not allowing the merger with" Lakeway. On April 2, 2010, the local newspaper ran an article reporting that Lakeway's talks with Lake Travis had fallen through and quoting a Lakeway board member's explanation that the Lake Travis facility "wasn't built as an acute-care facility that would meet [Lakeway's] needs" and that Lakeway's "architects and engineers couldn't make it work as an acute-care facility." In that article, Berry stated that Lake Travis "will have to shift its designation as a long-term acute care (LTAC) center to an acute-care provider because of

6

a three-year Medicare moratorium on new LTACs that won't expire until the end of this year." Berry explained that the "biggest difference in facility types" was that "Medicare patients would not be required to have a 25-day length of stay or greater to be reimbursed." On April 30, Lakeway sent HUD a letter asking for amendments to the HUD commitment, seeking a better interest rate and lower Level Annuity Monthly Payment, among other changes.

On May 8, 2010, Rip Miller, chairman and CEO of The Hospital at Westlake Medical Center, sent HUD an email asking why HUD was guaranteeing Lakeway's mortgage "when there is a similar private hospital about ½ mile away, . . . about 90% completed and scheduled to open this summer." He also said that Lake Travis would "be in direct competition to your guaranteed project" and that the "area is clearly NOT underserved." Robert Deen then sent Sossi an email stating that HUD had been told that "a new Lakeway Hospital, built with all private funds, will be opening in a few months and will be in direct (acute care general hospital) competition with the Lakeway Regional Medical Center" and that the area thus should not be considered underserved. Deen asked Sossi to tell him "[a]nything you can tell me about the Hospital," including whether it was "really an acute care hospital," the hospital's name, owners, and size, its development history, its financing, whether it was likely to open in the summer of 2010, and information about its medical staff.

On May 10, 2010, in the email that formed the basis of Lake Travis's claims, Sossi replied that the Lake Travis facility was designed as a long-term acute care facility but "missed the moratorium dates and has recently been discussed as a potential acute care." He said that Lakeway had investigated using the facility as a "jump start" while its main facility was built but had decided against it for several reasons. He said that Lake Travis was "designed as [a long-term acute care hospital] with 2 OR's in the basement," that the structure was "very small and has numerous code

7

issues related to the construction and design," that the "46 bed level would be very difficult to expand without changing the entire nature of the development," that it lacked adequate parking, and that its conversion from "a residential facility to a true acute care will cost a great deal of money." Sossi said that Lakeway was "not aware of any formal request to the City of Lakeway for a zoning change or the needed parking, traffic, or other impact studies that would be required for the conversion process" and that attempts to rezone the property would be challenged. He also explained that "when the questions related to any other suitable sites for [Lakeway] were raised with the City of Lakeway the answer was that ONLY the [Lakeway] site had proper zoning." As for whether the area was "underserved," Sossi answered, "Lakeway is underserved and this [Lake Travis long-term acute care] facility will not change that in a material manner." Sossi then provided information about the facility's name and its development history (a joint venture between HCN Interra and Healthcare REIT); stated that it would have forty-six beds and two small operating rooms and that it had "[l]imited imaging and major design issue[s]" for an acute care facility; stated that Lake Travis was "to be structured as a 100% interest only lease"; estimated the annual lease costs to be $3.5 million, "which appears to be prohibitive for the facility"; said he did not believe the facility would open in the summer of 2010 because it had "no operator on the horizon—no staff—just starting to shop it"; and said he was not aware that Lake Travis had any medical staff—"there was no list of interested physicians in the facility—some discussion of a group that may have an interest" in developing a free-standing clinic or center on the campus. Sossi concluded, "Our issue with the facility was the ability to work out all the design issues, the need for major retro fits to get it to open, the lack of physician interest for the facility, the zoning issues to allow the conversion to acute care status and what to do with the facility when [Lakeway] opens. The costs

8

and technical problems of conversion made the facility inappropriate to help [Lakeway] or to be able to succeed as a separate facility."

On May 20, HUD issued the amendments requested by Lakeway, and Lakeway's HUD-insured loan closed on May 21, 2010. On June 11, Lake Travis's counsel sent a letter to HUD protesting the mortgage guarantee and stating, "Lake Travis is an acute care hospital located approximately *one-half* mile from the future site of [Lakeway] and is slated to open in the fall of 2010—two years *before* [Lakeway] is expected to be complete. Lake Travis will serve the community in direct competition with the for-profit [Lakeway] project that HUD is using taxpayer dollars to guarantee." Lake Travis asserted that the area was not underserved and that HUD appeared to have made its decision "based on incomplete and inaccurate information." Lake Travis disputed HUD's statements that Lake Travis was not zoned for general acute care, saying that its C-1 zoning "expressly 'includes an Acute Care Hospital,'" that a later zoning ordinance by the city "creates an additional, but not exclusive, means of obtaining zoning for an acute care hospital," and that nothing in the new ordinance "states or implies that the ordinance has any impact on previously approved C-1 zoning, including the C-1 zoning unanimously approved for Lake Travis's acute care hospital." It further disputed that extensive redesign and retrofitting would be required for its facility to comply with applicable licensing standards and asked HUD to revoke its guarantee pending reevaluation of the Lakeway project.

In another communication that Lake Travis asserts disclosed confidential information, Sossi responded to Lake Travis's challenge on June 21, writing a letter to HUD stating that Lakeway had tried to work out a conversion plan with Lake Travis but was "unable to determine a conversion process that would allow for an effective use for the facility for general acute care services without

9

conversion costs that would make the project cost prohibitive" and that "[t]he existence of the plans for [Lake Travis] were discussed in detail with the HUD Client Service Team and the facility as planned would not appear to meet the general acute care needs for the Lakeway community." Sossi restated concerns related to the Lake Travis facility, including limited parking, the conversion from a residential care facility to an acute care facility, and modifications needed to meet acute-care licensing standards. He also stated that the area had a need for "well over the initial 104 beds for the [Lakeway] project and the needed capacity for the community [was] well in excess of both facilities," saying, "The need for the [Lakeway] project has been demonstrated and the purported availability of a limited number of beds, in a yet to be approved conversion of [Lake Travis], does not change that need." Sossi provided a letter from the Mayor of the City of Lakeway stating that although Lake Travis had implied that the city had approved "a General Development Plan for an 'acute care hospital,'" the mayor "remember[ed] the discussion as being one that discussed a long term care facility." The mayor explained that the city's "C-1 zoning, while not prohibiting [an acute care facility], does not specifically reference Acute Care Hospitals," and described the Lake Travis facility as "an unfinished building that has been under construction for over two years." The mayor also said that he did not believe the facility would be able to open in the fall of 2010, that extensive modifications would require city approval, and that there had been no communications with the city about changing the facility's business plan.

Lakeway opened to the public in April 2012. Meanwhile, Berry and McDonald unsuccessfully sought out other investors for the Lake Travis project. McDonald died in 2011, and Berry never located a partner with the general-acute-care experience HCN Interra required. Lake Travis eventually defaulted on its loan payments, and HCN Interra terminated the lease in 2012.

10

In April 2012, Lake Travis, as assignee of Berry and McDonald's estate, sued appellants for breach of contract, misappropriation of trade secrets, and negligent misrepresentation. Against the attorneys, it asserted claims for misappropriation of trade secrets and negligent misrepresentation. The parties filed competing motions for summary judgment. The trial court granted summary judgment for the attorneys on Lake Travis's claims for negligent misrepresentation and misappropriation of trade secrets, and Lake Travis later nonsuited its participatory liability theories against the attorneys, disposing of all claims against them. The trial court granted summary judgment for appellants on the following claims: misappropriation of trade secrets, breach of Section 2 of the Letter of Intent, and three of the five allegations of negligent misrepresentation. The case proceeded to trial on Lake Travis's remaining claims for breach of contract and negligent misrepresentation claims. The jury returned a verdict finding that appellants had not committed negligent misrepresentation but had breached the Letter of Intent[6] and awarded Lake Travis $7,900,000 in "loss of fair market value" damages due to the breach of contract.[7]

Appellants assert that the evidence is legally and factually insufficient to show that any breach of contract caused Lake Travis to suffer damages. They further argue that the evidence is legally and factually insufficient to support the jury's damage award; that Lake Travis only

---

[6] Lake Travis alleged in its live pleading that appellants had breached the Letter of Intent in several ways, but the only breach alleged and discussed on appeal concerns Sossi's May 2010 communications with HUD about the Lake Travis facility, which the parties seem to agree violated the Letter of Intent's confidentiality clause. Thus, the question to be answered is, "Did Sossi's May 2010 communications with HUD cause Lake Travis's asserted damages?"

[7] The jury found that Lake Travis should receive no lost-profits damages. It also found that Lake Travis had suffered $790,000 in loss of fair market value of its confidential information. Lake Travis elected to recover its breach-of-contract damages.

11

presented evidence of its own alleged damages, not damages suffered by Berry and McDonald, the signatories to the Letter of Intent; and that Lake Travis, as assignee of Berry and McDonald's rights, was limited to damages suffered by Berry and McDonald. Appellants contend in the alternative that there was a *Casteel* error in the jury charge that requires a new trial. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). Finally, SDP argues that the judgment against it must be reversed because (1) as Lakeway's agent, it was not a party to the Letter of Intent, (2) the jury was not asked whether SDP was a party to the Letter of Intent, and (3) the evidence was insufficient to show that SDP breached a duty that caused Lake Travis any damages.

Lake Travis cross-appealed, arguing that the trial court improperly granted summary judgment for all cross-appellees on its misappropriation-of-trade-secrets claim and on its claim that Lakeway and SDP breached Section 2 of the Letter of Intent. It further contends that the trial court abused its discretion in sustaining objections to some of Lake Travis's summary judgment evidence.

We disagree with Lake Travis's contention that the trial court improperly granted summary judgment on its claim that Section 2 was binding. We agree with appellants that the evidence is insufficient to show causation between Sossi's communications and Lake Travis's asserted damages, and our resolution of that issue is dispositive of the remaining issues on appeal.

**Standard of Review**

Evidence is legally insufficient to support a jury's verdict if there is a complete absence of evidence of an essential finding, the only evidence to support an essential finding cannot be considered, no more than a scintilla of evidence supports an essential finding, or the evidence conclusively establishes the opposite of the essential finding. *Service Corp. Int'l v. Guerra*,

12

348 S.W.3d 221, 228 (Tex. 2011); *Barry v. Jackson*, 309 S.W.3d 135, 139 (Tex. App.—Austin 2010, no pet.); *see Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 313 (Tex. 2015) (appellate court should sustain legal-sufficiency challenge if finding is supported by no more than scintilla of evidence). "[W]e consider the evidence and reasonable inferences tending to support the finding and disregard contrary evidence and inferences." *Melendez*, 477 S.W.3d at 313 (citing *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001)). However, the jury may not infer an ultimate fact from scant circumstantial evidence that could give rise to a number of other equally probable inferences. *Hancock v. Variyam*, 400 S.W.3d 59, 70-71 (Tex. 2013) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)). The jury is the sole judge of witness credibility and the weight to be given to the testimony, and we will not disturb its resolution of evidentiary conflicts that turn on credibility determinations or the weight of the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Barry*, 309 S.W.3d at 139. If the evidence is factually insufficient, we must detail relevant evidence and explain why the jury's determination is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly show bias. *Jackson*, 116 S.W.3d at 761.

### Causation

The jury found that appellants "fail[ed] to comply with the Letter of Intent," and Lake Travis asserts on appeal that appellants' breach was its taking Lake Travis's confidential information and "using that information to secure a $166 million HUD-backed mortgage" and that it was reasonable for the jury to infer that appellees' "communications with HUD caused HUD to

13

issue and defend" the guarantee. Appellants argue that the evidence is legally and factually insufficient to support a finding that Sossi's communications with HUD caused Lake Travis to suffer damages.

To recover damages, "a plaintiff must produce evidence from which the jury may reasonably infer that the damages sued for have resulted from the conduct of the defendant." *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995). The evidence must establish a "direct causal link" between the misconduct, the plaintiff's injury, and the damages awarded. *Id.* "Consequential damages are 'those damages which result naturally, but not necessarily from the acts complained of.'"[8] *Id.* at 182 (quoting *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex. 1992)). Although consequential damages need not be the usual result of the misconduct, they must be foreseeable, directly traceable to the wrongful act, and the result of it. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Damages that "are too remote, too uncertain, or purely conjectural" are not recoverable. *Id.* "[T]he burden is on the plaintiff to produce evidence from which the jury may reasonably infer that the damages claimed resulted from the defendant's conduct." *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997).

The allegation was that appellants' breach of the confidentiality clause caused Lake Travis to suffer $7,900,000 damages in "loss in fair market value." Lake Travis therefore had the burden of producing evidence from which the jury could find (1) that appellants' disclosure of confidential information caused HUD to guarantee Lakeway's mortgage, and (2) that HUD's mortgage

---

[8] The damages awarded by the jury for "loss of fair market value" fall into the category of consequential damages, not direct damages. Direct damages are "the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997).

14

guarantee led to the destruction of Lake Travis's business prospects, resulting in $7,900,000 in lost market value.

First, Lake Travis alleges several times that there is evidence that appellants' failure to disclose information about Lake Travis to HUD caused Lake Travis's damages.[9] This argument, however, ignores the fact that the breach of which Lake Travis complains is appellants' affirmative disclosure of confidential information, not non-disclosure. Evidence of non-disclosure is therefore no evidence that appellants' disclosure of confidential information caused damage to Lake Travis.

Second, we must note that although Lake Travis asserts that Sossi improperly disclosed Lake Travis's confidential information, it is not entirely clear exactly what information Lake Travis contends was confidential. This lack of specificity makes our analysis more difficult. In its briefing, Lake Travis points to Sossi's statements that: (1) the Lake Travis facility "is very small and has numerous code issues related to the construction and design," (2) conversion of the facility from long-term to general acute care would "cost a great deal of money," (3) Lakeway could not "work out all the design issues, the need for major retro fits," (4) Lakeway was concerned about a "lack of physician interest" in the Lake Travis facility, (5) Lakeway was concerned about zoning issues related to the conversion from long-term to general, (6) Lakeway had concerns about what to do with

_____

[9] Lake Travis several times asserts that appellants failed to disclose Lake Travis as a competitor in the area and should have more fully disclosed Lake Travis's plan to change to a general acute care structure (in essence complaining both that appellants should not have disclosed any information about Lake Travis and should have provided more information learned in their negotiations with Lake Travis). However, any failure to disclose would not have breached the Letter of Intent's confidentially provision. Further, although Lake Travis emphasizes that Sossi's March 2009 visit to the Lake Travis construction site was uninvited, that trespass, if it can fairly be characterized as such, did not breach the later-signed Letter of Intent.

15

the Lake Travis facility when the main Lakeway campus opened, and (7) the "costs and technical problems of conversion made the facility inappropriate" for Lakeway's needs. In its appellee's brief, Lake Travis also complains that Sossi invoked as concerns "(1) code violations; (2) inadequate parking; and (3) cost to convert to [Lakeway's] use."

Assuming that the information outlined by Lake Travis was indeed confidential and that Sossi obtained and disclosed the information in violation of the Letter of Intent, we turn to whether Lake Travis established that the disclosure of this alleged confidential information caused HUD to guarantee the loan.

It is undisputed that no one from Lakeway or SDP provided any information about Lake Travis to HUD before HUD's March 2010 commitment to guarantee Lakeway's mortgage.[10] *See* 24 C.F.R. § 242.17 ("Upon approval of an application for insurance, a commitment *shall be issued* by HUD setting forth the terms and conditions under which an insurance endorsement *shall be issued* for the hospital." (emphases added)). Deen testified on written questions that he was HUD's "lead account executive assigned to develop the client service team report and recommendation," and that he had "asset management responsibilities for the project." Deen testified that in March 2009, during its underwriting process, HUD found a newspaper article about

---

[10] Lake Travis asserts that the "initial commitment [was] not binding" and that HUD could have rescinded its commitment due to Lakeway's failure to disclose Lake Travis as a competitor, citing Title 12, Section 1709(e) of the U.S.C. as support. *See* 12 U.S.C. § 1709(e) (providing that contract of insurance is conclusive evidence of mortgage's eligibility for insurance and that contract for insurance is incontestable except for cases of fraud or misrepresentation by mortgagee). However, the record contains no indication that anyone at HUD had concerns that Lakeway had made any misrepresentations in the application process. Nor has Lake Travis made a claim on grounds that appellants' non-disclosure caused its damages.

16

"Lake Travis Transitional Hospital's development (at the time it was called Lake Travis Speciality Hospital)" that described the intended facility as "a long-term acute care hospital, not a general acute care hospital." Berry was quoted in the article "as saying that the hospital will have a 24-hour emergency room and would care for long-term acute patients who are recovering from traumatic injury or serious medical condition and need 25 or more days in the hospital."[11] On April 30, 2010, Lakeway requested amendments to HUD's guarantee. In May, after Miller questioned whether the area was underserved, HUD located another article about Lake Travis and sent Sossi its questions. Sossi responded, and Deen spoke to other people associated with Lakeway or SDP to verify the information provided by Sossi.[12] HUD issued the amendments requested by Lakeway on May 20, and the deal closed the next day.

---

[11] Appellants introduced into evidence two February 2009 newspaper articles. The first stated that Lake Travis planned to open a hospital in December 2009; quoted Berry as saying that the hospital was "licensed as an acute care hospital" but would focus on "patients who will have lengths of stay greater than 25 days." The other article stated that Lake Travis planned to begin "taking its first long-term, acute-care patients in February 2010" and that Lakeway was "expected to open in 2011 as an acute-care general hospital with 70 to 80 licensed beds and 25 ER beds." In that article, Berry stated that Lake Travis was "aimed at patients who have suffered a traumatic injury and are recovering or have some other serious medical problem and need at least 25 days or more in the hospital" and that he did "not see [Lake Travis] as competing with the planned regional medical center [Lakeway], which will be a mile or so away."

[12] Lake Travis notes that Deen testified that in June 2010, another HUD representative and an Assistant U.S. Attorney spoke to Sossi about his understanding of Lake Travis's licensing status and asserts that Sossi must have produced additional confidential information in those discussions, but the record contains no evidence about the substance of those conversations or whether those discussions had any effect on the HUD process. Further, we note that by that time, Lake Travis had intervened, informing HUD that it was an acute care hospital "slated to open in the fall of 2010," that it would be a direct competitor, that the area was not underserved, and that HUD appeared to have decided to guarantee Lakeway's mortgage "based on incomplete and inaccurate information."

17

Lake Travis did not produce any evidence that HUD considered revoking its initial commitment after receiving Miller's letter.[13] Nor did it produce any evidence that Sossi's May 10 email or June 21 letter had any effect on HUD's decision-making process, much less that his communications caused HUD to decide to issue the guarantee. The evidence establishes that at the time it committed to guaranteeing Lakeway's mortgage in March 2010, HUD knew that the Lake Travis facility had been approved by the City of Lakeway as a long-term acute care facility with forty-six beds and two operating rooms, and in June, HUD had already received considerably more information from Lake Travis itself, as well as information from the city about the two projects.

Lake Travis called as a witness Dr. Gary Lacefield, who worked for HUD for about ten years, leaving in 1999. Lacefield opined that Lakeway's "service area was not delineated correctly" in its application to HUD; (2) that an impact study should have been completed; and (3) that if HUD had "been made aware of all of the facts, primarily that there was . . . a 46-bed hospital that was 80 percent completed within a half a mile" of Lakeway's proposed site, it would not have approved the application. Lacefield explained that Lakeway listed only Westlake Medical Center as a competitor but should have included several other hospitals in a twenty to twenty-five mile radius.[14] Lacefield

---

[13] Indeed, if HUD felt that Lakeway had made misrepresentations in its application, it could have revoked its guarantee. Rather than revoke or express concerns, however, HUD defended its decision, telling Sossi in an email that it agreed that Lake Travis's objections were "without merit."

[14] Lacefield testified that all hospitals within twenty or twenty-five miles of the Lakeway site should have been included, including a large hospital in downtown Austin, and relied on internet maps to find hospitals within his asserted radius. However, the mayor of the City of Lakeway wrote letters in December 2009 and in June 2010 strongly advocating the need for a new, large hospital, explaining that getting from the Lakeway area to hospitals in Austin, most of which are between sixteen and twenty miles away and located on the east side of town, can take thirty minutes, which can be life-threatening in an emergency. Asked about the mayor's assertions that it was difficult to travel west to east from Lakeway, Lacefield, who lives in Arlington, Texas, said, "Well, that's his opinion. I don't know if it's more difficult to travel east to west."

18

also testified that if Sossi had responded to HUD's questions by simply telling HUD to seek answers from Lake Travis directly or by identifying Lake Travis "as a proposed general acute care hospital, currently under construction less than a half mile away," HUD would have had a duty to do a full review, which would have led to a conclusion that the Lakeway project was not worthy of a HUD hospital loan mortgage. However, Lacefield testified only about errors or omissions in Lakeway's HUD documents and Sossi's communications with HUD. He did not testify that Sossi's disclosures to HUD caused HUD's decision or even that it influenced it.

Further, during Lacefield's tenure at HUD, only about one-percent of the applications he worked on were related to Section 242, he never participated in a full Section 242 application process, and he admitted to having little experience with the Section 242 program in his career at HUD or since. Lacefield did not know how many people at HUD worked on the Lakeway application, how long the process took, or whether a full analysis was conducted.[15] Lacefield's testimony about the conclusions he believed should have been reached had HUD been provided with more complete information cannot be considered evidence of a causal connection between Sossi's communications about Lake Travis and HUD's decision to issue its guarantee.

By May 2010, HUD had already reviewed Lakeway's application over a period of approximately one year and decided to guarantee the mortgage. During that review process, HUD had learned that Lake Travis was under construction. HUD was asked by Lakeway on April 30 to make certain amendments, and when Miller emailed on May 8 to question HUD's determination

---

[15] Lacefield dismissed HUD's statement that it "went through a comprehensive evaluation" of the Lakeway project as "happy talk" because "[t]here was no comprehensive evaluation information provided in any of the information" he was given by Lake Travis's counsel.

that the area was underserved, Deen asked Sossi a few follow-up questions related to Lake Travis, received information that was largely already in the public domain, made some amendments to the guarantee, and left its commitment decision unchanged.  Similarly, when Lake Travis objected in June 2010, it provided more information about its project than had Sossi, and HUD again decided not to overrule its guarantee decision.

The question is not whether the HUD guarantee gave Lakeway a competitive advantage or made the Lakeway project possible at all; there is no dispute that it did.  The question is whether sufficient evidence was presented to establish that Sossi's disclosures in May 2010 caused HUD to guarantee the loan, and there is no evidence of that.  Moreover, there is no evidence that HUD started to second-guess its initial commitment after receiving Miller's email or that Sossi's responses in May affected HUD's process or decision.  The fact that the commitment's closing date, which occurred three weeks after Lakeway requested amendments, was also within about a week of Sossi's email to HUD does not give rise to a reasonable inference that the allegedly confidential information provided by Sossi caused HUD to decide to close the loan.  Making such an assumption would require us to attribute malfeasance or at least extreme negligence on the part of HUD in its discharge of its duties.  Instead, the timing reinforces a conclusion that HUD's investigation was finalized or in its end-stages and that Deen's inquiry following Miller's email was essentially just double-checking HUD's conclusions about the area to be served by the hospital.  Finally, Lake Travis disclosed information about its proposed switch to a general acute care facility when it objected to the HUD guarantee in June, and there is no evidence that HUD was swayed by those assertions or that any additional confidential information included in Sossi's June letter influenced HUD's decision to defend its guarantee.

20

A jury may not infer "an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another,'" *Hancock*, 400 S.W.3d at 70-71 (quoting *Edwards*, 958 S.W.2d at 392), and "[a]n inference is not reasonable . . . if it is premised on mere suspicion—'some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'" *Suarez v. City of Texas City*, 465 S.W.3d 623, 634 (Tex. 2015) (quoting *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727-28 (Tex. 2003)).

The equal-inference rule was recently discussed in *Hancock*, in which a dispute arose between Dr. Variyam, Chief of the Gastroenterology Division of a state-chartered medical school, and Dr. Hancock, an associate professor under Variyam. 400 S.W.3d at 62. Hancock wrote a letter to his department chair, the dean of the medical school, and an entity that was reviewing an application for accreditation for a fellowship in Variyam's division, stating that Variyam had a reputation for not being truthful and that he "deals in half truths, which legally is the same as a lie." *Id.* at 63. The fellowship was not accredited, Variyam was later removed as chief of his division, and Variyam sued Hancock for defamation. *Id.* A jury found in favor of Variyam, but the Texas Supreme Court reversed. *Id.* In its analysis, the supreme court considered whether the jury could reasonably infer from the denial of accreditation that Hancock's letter damaged Variyam's reputation and held that it could not because "there were multiple possible grounds for the accrediting body denying accreditation" and Variyam had not offered evidence that an inference that the letter caused the denial was more probable than other possible inferences. *Id.* at 70-71. Such an inference would "violate[] the equal inference rule, which provides that a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Id.* (quoting *Hammerly Oaks*, 958 S.W.2d at 392).

21

As in *Hancock*, here there were multiple reasons why HUD might have decided not to revoke its commitment to insure Lakeway's mortgage, and Lake Travis offered no evidence that the inference that Sossi's letters significantly influenced HUD's decision was more probable than the other possible inferences. *See id.*; *see also Suarez*, 465 S.W.3d at 634 ("An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion."). Lake Travis presented evidence that Deen sent a list of questions to Sossi, who answered them with information, some of which was already known from public sources and some of which was confidential, and that about a week later, the loan closed. The evidence also shows that Deen, ten other individual HUD employees, and a HUD committee were involved in the process, but does not indicate who made the final approval decision, whether the decision-makers were aware of Miller's concerns, or whether any of Sossi's communications were passed along to or influenced the decision-makers. Concluding based on this "meager circumstantial evidence" that the allegedly confidential information caused HUD to decide not to revoke its original commitment when there was no evidence that such a revocation was being considered would be nothing more than a guess. *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 895 (Tex. App.—Texarkana 2004, pet. denied). Thus, the jury's conclusion that Sossi's email was the cause of HUD's closing of the loan was an improper inference in violation of the equal-inference rule. *See Hancock*, 400 S.W.3d at 70-71; *see also Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014) (jury could not reasonably infer that defamation caused cancellations at funeral home "when the cancellations could have occurred for any number of reasons"). Even assuming that HUD's insuring of Lakeway's loan caused the damages asserted by Lake Travis, the evidence does not show that Sossi's disclosures *caused* HUD to complete the process of guaranteeing the loan. We hold that the

22

evidence is legally insufficient to show a causal connection between Sossi's alleged breach of the Letter of Intent and HUD's guarantee of Lakeway's mortgage. *See Guerra*, 348 S.W.3d at 228.

As for the sufficiency of the evidence supporting the jury's $790,000 award for loss of fair market value of Lake Travis's confidential information, we agree with appellants that the lost-market-value award also fails.

Lake Travis's argument is that Lakeway was able to complete its project thanks to the HUD guarantee, and that Lake Travis was unable to find investors due to Lakeway's facility, thus rendering its confidential information valueless. However, as we have explained, there is no evidence that the disclosure of Lake Travis's allegedly confidential information caused the HUD guarantee to issue. Because the record does not show that the HUD guarantee was due to Sossi's disclosure, there is no evidence that Sossi's disclosure caused the information to lose value.

Further, even assuming that the causation problem does not bar Lake Travis from recovering for loss of market value of its allegedly confidential information, the testimony related to the issue, set out below and all of which came from Berry himself, does not support the jury's conclusion:

- In discussing what Lake Travis asserted to be confidential information, Berry said he was talking about Lake Travis's entire "Project File"—architectural plans, program design and operations details, financial information, organizational information, mission, staff recruitment and retention information, sources and uses of other funds, financial feasibility information, projected revenues and costs, and construction status.

- The allegedly confidential information disclosed by Sossi was information about Lake Travis's state of construction, zoning issues, adequacy of parking, code compliance concerns, lack of

23

physician interest, and financing structure. However, Berry also asserted that many of Sossi's statements were factually incorrect.[16]

- Berry determined the fair market value of the information contained in the file was $7.9 million by looking at Lake Travis's "historical costs"—cash outlays and loans, the 12,000 man hours put into the project, salaries paid to his professional staff, and office expenses—plus the amount a willing buyer would pay a willing seller.

- Asked about the value of the information after Sossi's disclosures of a few pieces of information from the file, Berry said the information as a whole was "[v]irtually worthless" because it was no longer possible to find investors for the project.

That is the sum total of evidence about the fair market value of the information before and after the breach.

Lakeway asserts that Berry's testimony about the market value of the confidential information was conclusory, speculative, vague, non-probative, and lacking in reasonable certainty, and we agree. An owner may present evidence of the market value of his property, provided the testimony is based on market value, not personal value, and meets the same requirements as other

---

[16] Berry asserted that Sossi's statement that the Lake Travis structure was "small" was confidential information learned by touring the facility, but also admitted that Sossi could have gleaned that fact from driving by or by comparing its capacity to a 100-bed hospital. He was then asked about Sossi's assertion that the facility had "numerous code issues," and he said that Lakeway had information showing code issues and that Lakeway developed that information on their own. Berry next was asked about Sossi's assertion of inadequate parking and admitted that Lake Travis had not told Sossi that parking was a problem and that he did not have personal knowledge of how Sossi reached that conclusion. Asked about Sossi's statement that converting the facility from a residential facility to a general acute care facility would be very expensive, Berry first disagreed with Sossi's statement and then he said he did not know how Sossi reached that conclusion. Lakeway next asked Berry about Sossi's statements related to Lake Travis's financing, and Berry said that he believed Sossi based his statement on confidential information about Lake Travis's financing arrangements with Health Care REIT. Berry testified that he disagreed with Sossi's assertions about major retrofits, a lack of physician interest, zoning issues, and financial and technical problems with converting the facility for Lakeway's uses, saying it was untrue that there was no physician interest and that there were no zoning issues to speak of.

24

opinion evidence. *See Natural Gas Pipeline Co. v. Justiss*, 397 S.W.3d 150, 155-56 (Tex. 2012). However, "merely invoking that phrase [market value] does not make otherwise conclusory or speculative testimony legally sufficient." *Id.* at 161. Berry stated that he reached $7.9 million as a market valuation by combining the costs paid in developing the project (including cash outlays, loans, man hours, staff salaries, and office expenses) with the amount a willing buyer would pay a willing seller, explaining that he and others had invested $2.85 million in cash and had borrowed about $3.5 million, but he did not testify as to salaries, expenses, the value of man hours, or what amount a willing buyer would have paid for the information. Such "bare conclusions" do not amount to competent, probative evidence of market value. *See id.*; *see also Primrose Operating Co. v. Senn*, 161 S.W.3d 258, 263-64 (Tex. App.—Eastland 2005, pet. denied) (only evidence was of cost to restore land, which would not be economically feasible, not evidence of diminution of land's market value; because landowners did not present competent evidence of essential element of claim, court of appeals reversed and rendered).

Further, the amount chosen by the jury is not supported by the evidence. It is true that the record does not necessarily have to include evidence "corresponding to the precise amount found by the jury" and that we will not disregard a jury's finding "merely because its reasoning in arriving at its figure may be unclear." *Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied). However, neither may a jury "arbitrarily award an amount neither authorized nor supported by the evidence presented at trial." *Id.* In other words,

> when the evidence supports a range of awards, as opposed to two distinct options, an award of damages within that range may be an appropriate exercise of the jury's discretion. But where there is no rational basis for the calculation, the jury's finding

25

should be set aside. A jury may not arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial.

*Holland v. Lovelace*, 352 S.W.3d 777, 792-93 (Tex. App.—Dallas 2011, pet. denied) (citations omitted) (rejecting argument under which jury could essentially "assign any number as damages, provided that number is less than the high end testified to by the experts").

This is not a case in which there was evidence of differing values and a wide but still somewhat discernable range of possibilities for a damages award, as in *Pleasant*. *See* 260 S.W.3d at 560-61. Instead, this is more like *First State Bank v. Keilman*, in which the plaintiff asserted that $7,161.44 in interest was improperly charged, the defendant asserted that only $169.92 in interest was charged, all of which was proper, and the jury awarded $360. 851 S.W.2d 914, 931 (Tex. App.—Austin 1993, writ denied). In that case, we stated that the evidence presented by the parties "provided a relatively precise method for calculating unauthorized interest" and that the jury could have believed either side's evidence. *Id*. Rather than choosing either, however, we observed that "[e]xcept for the fact that the jury's figure falls in between the Keilmans' $7,161.44 figure and FSB's $0 figure, it appears that the jury pulled its answer out of a hat." *Id*.

Although the loss of market value of information is an amorphous concept not subject to binary calculations, the only evidence presented here was Berry's testimony: the information was worth nearly $8 million before the breach, was worth almost nothing after, and was rendered valueless because possible investors fell away with the breach. Berry did not give a range of value, nor is there any other evidence that the jury could have relied on to determine that the information

26

was worth nearly $7 million less than Berry asserted.[17]  And, although appellants asserted that they were not liable for damages for loss of value of the confidential information, they did not present evidence that the information had suffered no loss in market value or some figure substantially less than Berry's estimate.  Presented with one possibility of pre-breach value and one explanation for why the information was rendered valueless, the jury instead opted for a number not supported by evidence.  We cannot uphold a damages award that appears to have been pulled out of thin air.  *See id.*; *see also Swank v. Sverdlin*, 121 S.W.3d 785, 798-99 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (evidence insufficient when party presented specific damage model and argued "precise (albeit flawed) calculation" but jury award did not follow evidence presented).

We sustain appellants' first issue on appeal.[18]

## Cross-Appeal

On cross-appeal, Lake Travis asserts that the trial court erred (1) in determining that Section 2 of the Letter of Intent was not binding, (2) in granting summary judgment against it on its

---

[17]  Lake Travis asserts that the jury might have devalued Berry's estimate of market value based on evidence of mitigation.  However, the so-called mitigation evidence was that Lake Travis would have made somewhere between $7 million and $34.5 million over its first five years of operation had it been able to open, and Berry testified that the confidential information became valueless because he was not able to find new investors and thus could not continue the project through fruition.  Lake Travis does not point to evidence showing that it could have opened and earned profits despite appellants' alleged bad acts, thus mitigating its lost-market-value damages.

[18]  Although Lake Travis argues that we should remand for reconsideration of what damages it is owed for loss of its market value of confidential information, this is not a case in which Lake Travis relied on law that changed or evolved since trial.  *See Natural Gas Pipeline Co. v. Justiss*, 397 S.W.3d 150, 162 (Tex. 2012).  Lake Travis had the burden of proving the market value of its confidential information but failed to do so.  We will not remand for Lake Travis to have another bite of the apple.  *See Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 260 (Tex. 2004).

claims for misappropriation of trade secrets, and (3) in sustaining objections to some of its summary judgment evidence.[19] We first address Lake Travis's arguments related to Section 2.

As we stated earlier, Section 2 of the Letter of Intent stated that Lakeway "*will assume*" Lake Travis's Lease and that Lakeway would pay Berry and McDonald a total of $7.9 million for deposits, costs associated with developing the facility, and a $1.5 million lump sum payment. (Emphasis added.) Lake Travis argues that Section 2 was a binding agreement, contained all essential terms, and was "more than an agreement to agree." However, Section 3 explained that Section 2's provisions would only take effect if Lakeway's board approved, HCN Interra approved, a due-diligence investigation showed that Lakeway's proposed use of the facility would be feasible, Lakeway could obtain financing, and the parties developed "definitive documents" reflecting their intention as expressed in the Letter of Intent. Further, the Letter of Intent specified that its objective was to indicate Lakeway's and SDP's interest in having Lakeway take over Lake Travis's lease to use the facility as an initial campus until its main campus was completed. The Letter of Intent was made effective for an initial forty-five day period, subject to extension, and Berry and McDonald agreed not to negotiate with other parties while the Letter of Intent was in effect.

It is well established that when interpreting a contract, we seek "to ascertain and give effect to the intent of the parties as that intent is expressed in the contract," and that "[t]o discern this intent, we 'examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken

---

[19] We apply well-established standards when reviewing a trial court's decision on a motion for summary judgment. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872-73 (Tex. 2000).

alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.'" *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Applying that bedrock rule to this case, despite the affirmative language that Lakeway "will" take over the lease and pay Berry and McDonald $7.9 million, the Letter of Intent, when read in its entirety, clearly was not intended by the parties to be a final and binding agreement for Lakeway to assume Lake Travis's lease; it was a binding agreement governing the terms under which the parties were to negotiate and discuss whether Lakeway would assume the lease.

The Letter of Intent did not merely leave pending the "formalization of the agreement or negotiation of ancillary terms," *see Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex. App.—El Paso 2015, pet. denied), but instead specifically stated it was intended as a framework within which the parties would evaluate whether the Lake Travis facility would meet Lakeway's needs and whether they could reach mutually agreeable terms. The Letter of Intent was to be in effect for forty-five days, and at the conclusion of that period, the parties could either agree on an extension or negotiate with other parties. As in *Karns*, the Letter of Intent conditioned Lakeway's assumption of the lease on "completion of a final agreement," an agreement which did not come to fruition. *See id.* at 693-94. We overrule Lake Travis's second issue on cross-appeal.

We now consider Lake Travis's first issue, asserting that the trial court improperly granted summary judgment on its misappropriation-of-trade-secrets claim, and its third issue, arguing that the court improperly sustained objections to some of its summary judgment evidence.

29

To recover for misappropriation of trade secrets, a plaintiff must show "(1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied); *see Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366-67 (Tex. App.—Dallas 2009, pet. denied) ("Under Texas law, a plaintiff can recover for misappropriation of a trade secret by establishing: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or was discovered by improper means; (3) the defendant used the trade secret without the plaintiff's authorization; and (4) the plaintiff suffered damages as a result.").

Appellants moved for summary judgment on Lake Travis's claim for misappropriation of trade secrets on the following grounds: there was no evidence that they disclosed protected information; there was no evidence they had used protected information; and Lake Travis could not establish any injury as a result of the alleged improper use. *See* Tex. R. Civ. P. 166a(c), (i) (traditional and no-evidence motions for summary judgment). The attorneys moved for summary judgment on grounds that there was no evidence that (1) a trade secret existed; (2) the attorneys acquired, used, or disclosed any trade secrets; or (3) Lake Travis suffered damages. In response, Lake Travis produced its Project File—"a compilation of all the documentary evidence reflecting [Lake Travis's] trade secrets and proprietary information"—and a declaration sworn to by Berry. Berry stated that he had reviewed the Project File and that "[m]uch of the information" was confidential and proprietary, including architectural plans, financial information, organizational information, staffing information, and projections of costs and revenues. Berry said that Sossi's

30

May 10, 2010 email contained trade secrets, "specifically, information regarding [Lake Travis's] current state of construction, zoning, parking, code compliance, operations, staffing, financing, and physician support." However, in his deposition, attached to Lakeway's motion for summary judgment, Berry testified that the following of Sossi's statements were incorrect: that the conversion to general acute care would be expensive, that the facility would be difficult to expand, that there was no physician support, that the facility would not open in the summer of 2010, that there was no operator or staff, and that the city would have to approve a conversion from long term to general acute care. Cross-appellees also produced affidavit and deposition testimony by Sossi explaining that he gleaned the information he provided to HUD from public newspaper articles, his own personal investigation, and discussions with Health Care REIT.[20]

Lake Travis argues that it is reasonable to infer that HUD relied on Sossi's information, which it characterizes as disclosing trade secrets, in deciding to make the loan guarantee, and that it therefore should have been able to present to the jury a claim for lost profit damages. However, we have already held that there is no evidence of a causal link between Sossi's May 10, 2010 email and HUD's guarantee of the loan. Even if we assume that Lake Travis provided Lakeway, SDP, and the attorneys with trade secrets, that a confidential relationship was breached, and that a trade secret was used or disclosed improperly, we have already held that Lake Travis did

---

[20] Sossi stated in an affidavit that he received information about the Lake Travis project, "including financial information," from Health Care REIT, a former client, but that he did not use or rely upon Lake Travis's trade secrets or confidential information in corresponding with HUD. Although in its briefing Lake Travis asserts that Sossi lacked permission to use information obtained from Health Care REIT, in this context, a claim related to allegedly improper disclosures would belong to Sossi's former client, not Lake Travis.

not show a sufficient causal link between Sossi's communications about Lake Travis and HUD issuing its mortgage guarantee, which allegedly caused Lake Travis's damages. Without that causal link, Lake Travis cannot succeed on a claim for misappropriation of trade secrets. *See Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 737-38, 740 (Tex. App.—Dallas 2010, no pet.) ("plaintiff can recover for misappropriation of trade secrets by establishing (1) existence of a trade secret, (2) breach of a confidential relationship or improper discovery of a trade secret, (3) use of the trade secret without the plaintiff's authorization, and (4) resulting damages"; evidence was legally insufficient to show that sharing of confidential information induced third-party to enter into contract); *Speedemissions, Inc. v. Capital C Enters., Ltd.*, No. 01-07-00400-CV, 2008 WL 4006748, at *3 (Tex. App.—Houston [1st Dist.] Aug. 29, 2008, no pet.) (mem. op.) ("Speedemissions also had to show actual damages to prevail on its claim of misappropriation of trade secrets.").

As for its claim for royalty damages, Lake Travis asserts that causation is not a necessary element for its claim for reasonable-royalty damages and that "[t]he reasonable royalty remedy does not require proof" that HUD relied on appellants' disclosure of Lake Travis's confidential information, citing *Southwestern Energy Production Co. v. Berry-Helfand*, 491 S.W.3d 699, 711 (Tex. 2016). However, *Berry-Helfand* explains how to measure reasonable-royalty damages in a claim for misappropriation of trade secrets. *See id.* at 710-11. It does not hold that a causal link between the improper use of trade secrets and the plaintiff's damages, whether measured by lost-profit standards or reasonable-royalty standards, is unnecessary. We decline to read that requirement out of a misappropriation claim that seeks reasonable-royalty damages. And, although Lake Travis asserts that it raised a fact issue as to whether Lakeway, SDP, and the attorneys used Lake Travis's

32

confidential information "to disparage" Lake Travis as a competitor, thus obtaining HUD's mortgage guarantee, we have already held that, after a full trial, the evidence was legally insufficient to establish a causal link between any disclosure and the HUD guarantee. Without such a link, Lake Travis cannot recover reasonable-royalty damages for misappropriation of trade secrets.

Further, Lake Travis did not establish in the trial court what specific trade secrets were misappropriated, other than to point to the entire Project File as containing confidential information and then speculate that Lakeway, SDP, and the attorneys must have provided some of those trade secrets in their correspondence with HUD. It also relies on an inference that Sossi must have disclosed trade secrets in his attempts to "disparage" Lake Travis's status as a competitor. However, Lake Travis's summary judgment responses, simply speculating that cross-appellees must have used Lake Travis's confidential information, did no more than create a "mere surmise or suspicion" of use or disclosure of Lake Travis's trade secrets, *see Leal v. McDonald's Corp.*, No. 03-05-00500-CV, 2009 WL 2410853, at *5 (Tex. App.—Austin Aug. 5, 2009, no pet.) (mem. op.) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)) (discussing equal-inference rule and affirming granting of summary judgment when plaintiff presented no more than scintilla of evidence on causation).

Moreover, Berry testified in his deposition that Sossi did not provide HUD with correct information about: the costs to convert the Lake Travis facility from long term to general acute care; the difficulty of expanding the facility in the future; the status of Lake Travis's physician support, operator, and staffing; Lake Travis's ability to open in the summer of 2010; and whether the City of Lakeway would have to approve Lake Travis's conversion from long term to general acute

33

care. Therefore, Lake Travis's evidence purporting to show what trade secrets were misappropriated also shows that Lake Travis believed that the information provided by Sossi to HUD was false and therefore could not have consisted of Lake Travis's trade secrets. We overrule Lake Travis's issue as it relates to a reasonable-royalty measure of damages.

As for the trial court's sustaining of Lakeway's objections to Lake Travis's Project File, which was produced as summary judgment evidence to show Lakeway's misappropriation of Lake Travis's proprietary and trade secret information, even assuming the trial court abused its discretion in making that decision, the lack of causation evidence produced at trial and our discussion of the trade-secrets issues render the question moot. We overrule Lake Travis's third issue on cross-appeal.

**Conclusion**

Lake Travis did not produce more than a scintilla of evidence establishing that Sossi's communications to HUD about Lake Travis's facility and status caused HUD to follow through on its already established plan to guarantee Lakeway's mortgage. We therefore reverse the trial court's judgment on the jury's verdict and render judgment that Lake Travis should take nothing from Lakeway and SDP. As for the cross-appeal, we affirm the trial court's granting of summary judgment in favor of Lakeway, SDP, and the attorneys.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin, and Field

Appeal:  Reversed and Rendered on Motion for Rehearing

Cross-Appeal:  Affirmed on Motion for Rehearing

Filed:  February 17, 2017